# United States Court of Appeals
## For the First Circuit

No. 11-1510

UNITED STATES,

Appellee,

v.

ANTHONY RABBIA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Lynch, Chief Judge,
Boudin and Lipez, Circuit Judges.

Robert M. Greenspan for appellant.
Seth R. Aframe, Assistant United States Attorney, with whom John P. Kacavas, United States Attorney, was on brief, for appellee.

November 7, 2012

**LIPEZ**, **Circuit Judge**.  Appellant Anthony Rabbia was indicted in federal district court on two counts of being a felon in possession of firearms and ammunition in violation of 18 U.S.C. § 922(g)(1).  Rabbia moved to suppress the ammunition, as well as inculpatory statements he made in connection with his arrest.  After an evidentiary hearing, the district court denied the motion.  Rabbia then entered a conditional guilty plea on both counts, reserving his right to appeal the denial of his suppression motion.  He now exercises that right.  Finding no error in the district court's ruling, we affirm.

## I.

The following facts are drawn from the district court's findings of fact in its bench decision, as well as the testimony taken at the evidentiary hearing.  See United States v. Chaney, 647 F.3d 401, 403 (1st Cir. 2011).

At 11:00 p.m. on September 3, 2008, police detectives Derek Sullivan and Emmett Macken were patrolling an area in downtown Manchester, New Hampshire they knew to be the site of significant drug trafficking activity.  Sullivan and Macken were members of the Manchester Police Department's Street Crime Unit, a plain clothes unit assigned to urban neighborhoods with high rates of criminal activity.  A majority of the unit's arrests were related to drug crimes and, in the detectives' experience, the individuals involved in these crimes tended to be armed.

-2-

While driving an unmarked vehicle, Sullivan and Macken observed a small group of men gathered in front of 282 Concord Street, a rooming house known to the detectives to be a center of drug activity. One of the men, later determined to be Joshua Lacy, reached into his waistband with his hand concealed by his shirt, which led Macken to suspect that he was carrying a gun. Concerned, the detectives parked their vehicle one block away and got out to conduct surveillance on foot.

After watching the group for a short while, the detectives saw Lacy and another man, later identified as Bryan Bleau, separate from the group and walk to a parking lot behind 282 Concord Street that abutted a busy public alleyway. There, they were joined by a third man, who remains unidentified. As the three men were conversing, Lacy held out his wallet, and the detectives heard him say to the unidentified man "I already gave you $70" and "don't let me down." The unidentified man then left the lot.

Believing that they were observing the beginnings of a drug deal, the detectives continued to watch Lacy and Bleau. After several minutes, a black Honda Civic pulled into the parking lot, and Bleau entered the passenger's side door. The Civic then drove away. When it returned a few minutes later, Bleau emerged from the passenger's side door and retrieved a bag from the trunk. Expecting the bag to contain drugs, the detectives decided to approach Lacy, Bleau, and the driver of the Civic, later identified

as Rabbia.  Because they were outnumbered three to two, Sullivan and Macken called for backup to detective Paul Thompson, who was nearby.

Without waiting for Thompson, Sullivan and Macken drew their service weapons and approached the trio.  Lacy and Bleau were standing in the parking lot.  Rabbia was still seated in his car.  Because the detectives were wearing civilian clothes, they announced themselves as police officers and displayed their badges.  Macken then ordered Lacy and Bleau to lay on the ground and proceeded to pat-frisk and handcuff them.  As he was restraining Lacy and Bleau, Macken was joined by Thompson, who began to question Bleau about the contents of the bag he had removed from the Civic.

Meanwhile, Sullivan walked up to the Civic alone with his weapon drawn.  He was approximately thirty or forty feet from Macken and Thompson, who were occupied with Lacy and Bleau.  From where he stood, Sullivan could only see Rabbia's upper body and could not determine if he was armed.  Sullivan instructed Rabbia to exit the car.  When he complied, Sullivan placed him in handcuffs.  As he did so, Sullivan told Rabbia that he was not under arrest, that he was being handcuffed as a safety measure, and that the handcuffs would be removed when other officers arrived.  Rabbia indicated that he understood.  Sullivan then pat-frisked Rabbia for weapons and found none.  During the frisk, Sullivan reiterated that

-4-

Rabbia had been handcuffed as a precaution and that the handcuffs would be removed when additional officers appeared.

While Rabbia was still in handcuffs, Sullivan heard Thompson say that the bag retrieved from the Civic contained a gun. Shortly thereafter, another officer arrived on the scene and, as promised, Rabbia's handcuffs were removed. In all, he had been handcuffed for approximately five minutes.

After the handcuffs were removed, Sullivan asked Rabbia what he had been doing, without advising him of his constitutional rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966). When Rabbia responded that he had been giving Bleau a ride home, Sullivan replied that he did not believe him. Rabbia then said that he had picked up Bleau and sold the gun in the bag to him for $200. Sullivan asked Rabbia to describe the gun, and Rabbia identified the weapon as a shotgun. Sullivan confirmed with Thompson that the bag contained a 12-gauge shotgun and shells.

After a records check revealed that Rabbia and Bleau had previously been convicted of felonies, they were formally arrested for unlawful possession of a firearm and ammunition following a felony conviction.[1] See 18 U.S.C. § 922(g)(1). About thirty minutes had elapsed since Sullivan first confronted Rabbia.

Rabbia was then transported to the police station and read his Miranda rights. He waived those rights and gave a more

---

[1] Lacy was released.

-5-

complete description of the gun sale. Rabbia and Bleau had been imprisoned together previously. As they were finishing their sentences and leaving prison, Rabbia told Bleau that he had a gun he wanted to sell. Bleau later contacted Rabbia to purchase the gun, offering to pay $200. They arranged a meeting place for the sale, which is what led to the events immediately prior to the encounter described above.

At the police station, Rabbia gave written consent to search a room in his mother's apartment, where he claimed to be living. That search was unproductive, but Rabbia's mother informed the detectives that he had in fact been staying with his girlfriend in a different apartment. Rabbia's girlfriend consented to a search of her apartment and, in a drawer containing Rabbia's clothing, the detectives found a box of .45 caliber shells and an empty box of 12-gauge shotgun shells.

After he was indicted, Rabbia moved to suppress his statements, as well as the ammunition discovered at his girlfriend's apartment. The district court denied the motion, and Rabbia entered a conditional guilty plea without prejudice to his right to appeal the suppression ruling. See Fed. R. Crim. P. 11(a)(2). He was sentenced to thirty-seven months of imprisonment to be followed by three years of supervised release. This appeal followed.

In evaluating the denial of Rabbia's suppression motion, we review the district court's findings of fact for clear error and its legal conclusions de novo. See Chaney, 647 F.3d at 405; United States v. Battle, 637 F.3d 44, 48 (1st Cir. 2011).

Rabbia raises two challenges to the district court's ruling. First, he argues that his initial stop in the parking lot was an unlawful seizure because it was not based on a reasonable suspicion that he was involved in criminal activity, as required by the Fourth Amendment under the rule announced in Terry v. Ohio, 392 U.S. 1 (1968). Next, he argues that the stop, even if lawful at its inception, evolved into a de facto arrest long before he was formally arrested and that he was therefore entitled under the Fifth Amendment to Miranda warnings before any questions were asked of him. We address each contention in turn.

## A. The Fourth Amendment Challenge

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. In Terry, the Supreme Court held that, consistent with this prohibition, "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." 392 U.S. at 22. More specifically, a police officer is permitted to make a brief investigatory stop, commonly known as a Terry stop,

based on a reasonable suspicion that criminal activity may be afoot. See United States v. Brake, 666 F.3d 800, 804 (1st Cir. 2011); United States v. Pontoo, 666 F.3d 20, 26 (1st Cir. 2011). "[T]he officer must have a particularized and objective basis for suspecting the person stopped of criminal activity, rooted firmly in specific and articulable facts." Brake, 666 F.3d at 804 (quoting Pontoo, 666 F.3d at 28) (internal quotation marks omitted).

Sullivan and Macken observed Lacy and Bleau engage with another man in what seemed to be the first stage of a commercial transaction in the parking lot behind 282 Concord Street. Lacy held out his wallet to the man and said "I already gave you $70" and "don't let me down." The detectives then saw the man leave and Rabbia drive into the parking lot, pick up Bleau, and drop him off again a few minutes later. Bleau then removed a bag from the trunk of Rabbia's car, appearing to complete the transaction.

A reasonably prudent and experienced police officer would have recognized this behavior as consistent with the consummation of a drug deal. See United States v. Miller, 959 F.2d 1535, 1539 (11th Cir. 1992) (describing drug transactions in which "the supplier arrived by car, [the customer] got in the car, the car drove around the block during which time the exchange of drugs for money occurred, and then the car returned to the residence and dropped [the customer] off"); United States v. Morris, 223 F. App'x

491, 495 (7th Cir. 2007) (referring to "behavior consistent with drug-dealing, namely entering a car, riding around the block, and then exiting the vehicle"); cf. United States v. Funches, 327 F.3d 582, 586 (7th Cir. 2003) ("Experienced agents would recognize the use of an intermediary and the parties moving to a less-visible location before goods are exchanged as common characteristics of drug transactions undertaken to protect the identity of sellers and to avoid detection by authorities.").

Although the behavior in question also could have been consistent with legitimate commercial activity, the circumstances "reasonably supported a more sinister explanation." Brake, 666 F.3d at 805; see also United States v. Stanley, 915 F.2d 54, 57 (1st Cir. 1990) ("Under Terry, the test is whether the circumstances give rise to a reasonable suspicion of criminal activity, not whether the defendant's actions are subject to no reasonable innocent explanation."); cf. Illinois v. Wardlow, 528 U.S. 119, 124 (2000) ("Even in Terry, the conduct justifying the stop was ambiguous and susceptible of an innocent explanation."). Here, those circumstances included Rabbia's presence late at night in an area known to be a hotbed of drug activity. On its own, of course, the character of the location where a stop occurs "is insufficient to create reasonable suspicion," United States v. Am, 564 F.3d 25, 30 (1st Cir. 2009), and we do not suggest that residents of poorer urban neighborhoods, where crime typically is

more prevalent than in nearby suburban communities, may be detained on suspicion of criminal activity simply because of where they live. See United States v. Brown, 334 F.3d 1161, 1165 (D.C. Cir. 2003) (stating that "an individual's presence in [a certain neighborhood], 'standing alone, is not enough to support reasonable, particularized suspicion that the person is committing a crime'" (quoting Wardlow, 528 U.S. at 124)). However, "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." Wardlow, 528 U.S. at 124. Accordingly, Rabbia's presence at 11:00 p.m. in a neighborhood with a high incidence of drug crimes is a relevant consideration supporting the reasonableness of the detectives' suspicion that he was involved in a drug deal. See id.; Am, 564 F.3d at 30 (noting that location "is clearly a consideration that a police officer may use to decide to make a Terry stop" (quoting United States v. Kimball, 25 F.3d 1, 7 (1st Cir. 1994) (internal quotation marks omitted)).

It is of no constitutional significance that, as it turned out, Rabbia was involved in an illicit gun sale, not a drug deal. See Pontoo, 666 F.3d at 28 ("In carrying out a Terry stop, a police officer is not required to possess the clarity of vision that arises only in hindsight."). There was a particularized and objective basis for suspecting Rabbia of criminal activity, rooted

firmly in specific and articulable facts, even if the nature of that activity ultimately proved different than Sullivan and Macken originally thought. As a result, the Terry stop was justified at its inception, and we find no error in the district court's ruling that it did not constitute an unlawful seizure warranting the suppression of evidence.

## B. The Fifth Amendment Challenge

Rabbia also seeks to suppress the statements he made at the scene of the encounter, which included comments inculpating him in the gun transaction and identifying the firearm in question, due to the officers' failure to give him proper Miranda warnings. As noted, "[i]n the context of a motion to suppress, we review a district court's factual findings for clear error [and] review a district court's legal conclusions de novo." United States v. Trueber, 238 F.3d 79, 91 (1st Cir. 2001) (citation omitted). "[T]he ultimate conclusion whether a seizure is a de facto arrest 'qualifies for independent review' because it presents a 'mixed question of law and fact.'" United States v. Fornia-Castillo, 408 F.3d 52, 63 (1st Cir. 2005) (quoting Trueber, 238 F.3d at 91, 93).

"Because a Terry stop allows an individual to be seized on less than probable cause, the extent of that intrusion must be limited." Pontoo, 666 F.3d at 30. If those limits are exceeded, the stop may evolve into a de facto arrest, and if it does, the

suspect is entitled under the Fifth Amendment to <u>Miranda</u> warnings before being interrogated.  <u>See</u> <u>Fornia-Castillo</u>, 408 F.3d at 63.

There is no bright line that distinguishes a valid <u>Terry</u> stop from a de facto arrest:

> Instead, we inquire, in light of the totality of the circumstances, whether a reasonable person in the suspect's position would have understood her position to be tantamount to being under arrest.  This objective, suspect-focused inquiry is informed by our assessment of the reasonableness of the detaining officer or officers' actions in response to developing conditions.  Where an investigatory stop is justified at its inception, it will generally not morph into a de facto arrest as long as the actions undertaken by the officer[s] following the stop were reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officer[s] during the stop.

<u>Chaney</u>, 647 F.3d at 409 (alterations in original) (quoting <u>Trueber</u>, 238 F.3d at 92) (internal quotation marks omitted).  Whether a <u>Terry</u> stop has escalated into a de facto arrest depends on a number of factors, including, <u>inter alia</u>, the location and duration of the stop, the number of police officers present at the scene, the degree of physical restraint placed upon the suspect, and the information conveyed to the suspect.  <u>See</u> <u>Pontoo</u>, 666 F.3d at 30; <u>Fornia-Castillo</u>, 408 F.3d at 63.  "Above all, an inquiring court must bear in mind that it would be unreasonable to require that police officers take unnecessary risks in the performance of their

-12-

duties." Pontoo, 666 F.3d at 30 (quoting United States v. Taylor, 162 F.3d 12, 18 (1st Cir. 1998) (internal quotation marks omitted).

Rabbia contends that the combination of Sullivan's display of his service weapon, his use of handcuffs, and his pat-frisk quickly transformed his stop into a de facto arrest. As a result, he asserts that he should have been advised of his Miranda rights before Sullivan began questioning him in the parking lot.

While we have held that none of these measures, considered individually, necessarily converts a valid Terry stop into a de facto arrest, see Pontoo, 666 F.3d at 30-31; Chaney, 647 F.3d at 409; Fornia-Castillo, 408 F.3d at 64, the presence of all three in a single encounter warrants a careful examination of the facts. When addressing the use of handcuffs, we have looked for

> some specific fact or circumstance that could have supported a reasonable belief that the use of such restraints was necessary to carry out the legitimate purposes of the stop without exposing law enforcement officers, the public, or the suspect himself to an undue risk of harm.

Acosta-Colon, 157 F.3d at 18-19 (emphasis omitted). A fortiori, specific facts or circumstances justifying the use of officer safety measures must be present when the use of handcuffs is combined with other indicia of arrest.

"[T]he intrusiveness of the measures taken . . . is only part of the equation," however. Pontoo, 666 F.3d at 30. When officer safety is a legitimate concern, these prophylactic measures

-13-

can be employed, even in combination, without exceeding the constitutional limits of a Terry stop. See id. at 30-31; see also United States v. Mohamed, 630 F.3d 1, 6-7 (1st Cir. 2010) (observing that "valid concerns for [officers'] safety during the stop" justified use of drawing weapons, surrounding defendant, and using handcuff and pat-frisk during brief detention).

In this case, Rabbia was stopped because of a reasonable suspicion that he was trafficking in drugs, which suggested to Sullivan that he might be armed, given that "drug dealing is often associated with access to weapons." United States v. Acosta, 67 F.3d 334, 339 (1st Cir. 1995); cf. United States v. Cooper, 19 F.3d 1154, 1163 (7th Cir. 1994) (stating that "weapons are tools of the trade of drug dealers" (internal quotation marks omitted)). Because Rabbia was seated in his car, the lower half of his body was not visible as Sullivan approached him, and he easily could have been concealing a weapon. What is more, Sullivan was effectively alone in confronting Rabbia, with Macken and Thompson busy detaining Lacy and Bleau thirty to forty feet away. Cf. Fornia-Castillo, 408 F.3d at 65 (holding that stop did not ripen into arrest in part because detaining officer initially "was the only officer on the scene" (internal quotation marks omitted)). Under these circumstances, there was good reason for Sullivan to fear that Rabbia was armed and dangerous, and to neutralize the risk of harm by drawing his weapon, applying handcuffs, and

conducting a pat-frisk.  See Acosta-Colon, 157 F.3d at 18 ("Police officers engaged in an otherwise lawful stop must be permitted to take measures . . . they believe reasonably necessary to protect themselves from harm . . . .").

Moreover, other relevant facts support the conclusion that Sullivan's prophylactic measures did not transform Rabbia's stop into an arrest.  See Fornia-Castillo, 408 F.3d at 65 (noting that use of handcuffs and drawing of weapon were justified in part because encounter took place on "busy public street" and interaction between officers and defendant "was not confrontational or bellicose").  Rabbia was stopped and detained in a parking lot abutting a busy public alleyway.  See United States v. Lee, 317 F.3d 26, 31 (1st Cir. 2003) (noting fact that suspect was "detained and questioned in a public place" as factor weighing against arrest).  The officers explicitly informed Rabbia that he was not under arrest, that he was being handcuffed as a safety measure and that the handcuffs would be removed when other police officers arrived, which should have clarified the circumstances to a reasonable person.  See Pontoo, 666 F.3d at 30 (noting that "information conveyed to the detainee" is relevant consideration) (quoting United States v. Sowers, 136 F.3d 24, 28 (1st Cir. 1998)).  The handcuffs were, in fact, removed as soon as another officer appeared.

The relative brevity of Rabbia's detention further undermines the notion that he was de facto arrested. The handcuffs remained on him for only five minutes, see Fornia-Castillo, 408 F.3d at 65 (handcuffs remained on suspect for ten or fifteen minutes and were removed when other officers arrived), and no questioning occurred until after the handcuffs were taken off. In all, Rabbia was detained for only thirty minutes or thereabouts before being formally arrested. See Mohamed, 630 F.3d at 7 (stating that brief detention supported conclusion that encounter was only "valid investigatory stop"); see also United States v. Owens, 167 F.3d 739, 749 (1st Cir. 1999) (detention of fifty minutes was not de facto arrest); Sowers, 136 F.3d at 28 ("at least" thirty minute detention was not de facto arrest); United States v. McCarthy, 77 F.3d 522, 531 (1st Cir. 1996) (seventy-five minute detention in police car was not de facto arrest).

We acknowledge that the use of measures such as handcuffs or drawing guns are among "the most recognizable indicia of a traditional arrest." Acosta-Colon, 157 F.3d at 18. The circumstances that we have identified, however, indicate that "[t]he stop at issue here, while intrusive, was both proportional to the occasion and brief in duration." Pontoo, 666 F.3d at 31. Therefore, the district court properly declined to grant Rabbia's suppression motion on the ground that evidence had been obtained as a result of a violation of the Fifth Amendment.

Affirmed.

-16-