# United States Court of Appeals
## For the First Circuit

Nos. 13-2139,
     13-2427

UNITED STATES OF AMERICA,

Appellee,

v.

ALEXIS CANDELARIO-SANTANA, and
DAVID OQUENDO-RIVAS,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Howard, Chief Judge,
Torruella and Selya, Circuit Judges.

Alan J. Black, for appellant Candelario-Santana.
Linda Backiel, for appellant Oquendo-Rivas.
Jenny C. Ellickson, U.S. Department of Justice, Criminal
Division, Appellate Section, with whom Leslie R. Caldwell,
Assistant Attorney General, and Sung-Hee Suh, Deputy Assistant
Attorney General, were on brief, for appellee.

August 17, 2016

**TORRUELLA**, **Circuit Judge**.   These consolidated appeals stem from a drug-related mass shooting carried out in furtherance of a Racketeer Influenced and Corrupt Organizations Act ("RICO") enterprise.   Following the shooting, a federal grand jury in the United States District Court for the District of Puerto Rico returned a fifty-two count superseding indictment charging Alexis Candelario-Santana ("Candelario") and David Oquendo-Rivas ("Oquendo") (collectively, "Defendants-Appellants") with violent crimes in aid of racketeering activity ("VICAR").   Candelario was further charged with a number of drug trafficking offenses and thirteen RICO conspiracy-related murders.   The Government sought the death penalty for Candelario.   Defendants-Appellants were tried jointly before, and found guilty on all counts by, a death-qualified jury.   As the jury failed to reach a unanimous decision on whether Candelario should receive a death sentence, both defendants received life sentences.   Defendants-Appellants timely filed notices of appeal, deploying a veritable flotilla of challenges.   We affirm Oquendo's convictions but vacate and remand as to Candelario.

## I.  Background

We include the foundational facts in this section and delve into facts essential to each issue raised on appeal in our analysis.

In 1993, Candelario became the head of a drug-trafficking organization, known as the Palo de Goma drug point, operating in the Sabana Seca ward of Toa Baja, Puerto Rico. Throughout the 1990s, Candelario retained exclusive control over drug sales in the surrounding areas, often through violent means. Aided by Braulio Rodríguez ("Menor"), Candelario murdered or arranged the murder of at least a dozen individuals.  In the late 1990s, Candelario fled to Michigan in an attempt to avoid arrest, leaving his cousin, Wilfredo Semprit-Santana ("Rufo"), and Carmelo Rondón-Feliciano ("Omi") to oversee day-to-day operations at Palo de Goma.[1]  In return, Rufo and Omi agreed to "pay rent" to, that is, share the drug proceeds with, Candelario.  In 2003, Candelario pleaded guilty to a dozen murder charges in Puerto Rico court. Rufo and Omi continued making payments to Candelario for use of the drug point.  At some point, Candelario's relationship with Rufo and Omi began to deteriorate; the duo stopped making payments to Candelario, who threatened them.  In 2006, following Omi's

---

[1]  In his testimony, Rufo claimed that only Omi was left in charge of the drug point.

-4-

arrest by federal authorities, Rufo's brother, Pedro Semprit-Santana ("Semprit"), joined Palo de Goma, also declining to make payments to Candelario.

In February 2009, Candelario was released from prison. That same year, Rufo rented and renovated La Tómbola, a mini-market and bar located in Sabana Seca. During La Tómbola's opening night party on October 17, 2009, several shooters attacked attendees, killing nine and injuring more than a dozen people. Following the events at La Tómbola, three eyewitnesses identified Oquendo as a gunman. Two others identified Candelario. Another witness identified the voice of a shooter as that of Candelario.

## II.  **Procedural History**

A federal grand jury returned a fifty-two count superseding indictment against Candelario and Oquendo. Counts two to forty-nine charged Defendants-Appellants with VICAR activity and with carrying firearms during and in relation to crimes of violence in violation of 18 U.S.C. §§ 1959 and 2 and 18 U.S.C. §§ 924 and 2, respectively. The indictment also charged Candelario with conspiracy to engage in a racketeering enterprise, in violation of 18 U.S.C. § 1962(d); conspiracy to possess with intent to distribute crack cocaine, cocaine, heroin, and marijuana, in violation of 21 U.S.C. § 846; and possession of a

firearm by a prohibited person, in violation of 18 U.S.C. § 922(g)(1).

We take each relevant issue on appeal in turn, beginning with Oquendo's challenge to the district court's refusal to suppress statements he made on the day of his arrest, proceeding to Oquendo and Candelario's claim of unconstitutional closure, Oquendo's potpourri allegations of trial error, and Oquendo's challenge to the jury instructions, and finally concluding by dispensing of Oquendo's insufficiency of the evidence claim.

### III. <u>Oquendo's Statements on the Day of His Arrest</u>

Several days after the shooting, Puerto Rico Police Department ("PRPD") Officer Carlos Rodríguez-Negrón ("Rodríguez") received information that the individuals who perpetrated the La Tómbola shooting were hiding in a small neighborhood in Sabana Seca. As we recounted in an earlier, related case:

> rumors led officers from the [PRPD] to a . . . home, where several men involved in the murders were thought to be hiding. Arriving at the residence, officers observed three men standing in its fenced-in yard. Startled by the officers, one man -— later identified as Oquendo -- lifted his shirt to reveal a firearm in his waistband. All three men then fled. One, exiting the yard, successfully evaded the ensuing pursuit; he has never been identified. The other two, Oquendo and . . . Christian Ortiz-Rivera ("Ortiz"), ran up an exterior staircase and into the home's second-story interior. The officers gave chase.

> Entering the home's upper level, [Rodríguez] observed Oquendo toss a handgun out of the window. Soon after, Officer Rodríguez and Officer Roberto Cruz grabbed

Oquendo and restrained him on the floor. While demobilizing Oquendo, they heard a fellow officer call out from below, indicating that he had possession of the thrown weapon. Officer Rodríguez then entered an adjoining bedroom, where he witnessed Ortiz attempting to hide two more firearms in a laundry basket. One of these guns had an obliterated serial number. Subsequent to detaining both men, but before their formal arrest, Officer Rodríguez asked if they were licensed to possess firearms. Oquendo and Ortiz both answered, "no."

After being placed under formal arrest and verbally read his Miranda rights, Oquendo was taken to the police station in Bayamón, Puerto Rico for questioning. There, Officer Rodríguez provided him with a Spanish-language Miranda waiver form. This form set forth, in a bullet-point list, the nature of Oquendo's Miranda rights. Under that bulleted description, the form provided space for Oquendo to waive his rights by consenting to make a statement outside the presence of a lawyer, if he so desired. After reviewing the form, Oquendo indicated that he did not wish to make a statement. No questions were asked and, after signing and dating the form, Officer Rodríguez left the room.

Approximately twenty minutes later, Agent Julio Torres ("Agent Torres") from the federal Alcohol, Tobacco, Firearms and Explosives Bureau ("ATF") entered Oquendo's interrogation room. Agent Torres handed Oquendo another blank copy of the Spanish-language Miranda waiver form. After reviewing this duplicate form, Oquendo wrote next to the portion of the form related to waiver, "I do not understand this, my lawyer speaks." Agent Torres then verbally read Oquendo his Miranda rights and, upon seeing the note, asked Oquendo what he did not understand. In response, Oquendo indicated that he was willing to speak without a lawyer present, but that he did not want to answer any questions about the deaths at La Tómbola. Agreeing to limit the scope of his questions, Agent Torres had Oquendo circle the portion of the waiver form consenting to speak without a lawyer. Both Oquendo and Agent Torres then signed the form, and questioning began. During the course

of his interrogation, Oquendo made statements indicating that he knew Ortiz possessed a gun with an obliterated serial number.

United States v. Oquendo-Rivas, 750 F.3d 12, 14-15 (1st Cir. 2014).

In this case, Oquendo filed a motion to suppress statements made to law enforcement. At the suppression hearing, Rodríguez described "put[ting] [Oquendo] down on the floor" "real fast" and said he "put [him] under arrest for [his] safety." Rodríguez stated that he twice Mirandized both men. According to Rodríguez, both men replied "[t]hat they're clear. That both weapons are theirs, but that they are not involved whatsoever with the events that occurred at La Tómbola." Rodríguez later amended his statement, adding that, as noted above, prior to Mirandizing Oquendo and Ortiz, he asked them whether they had a firearms license, and both men responded in the negative. At that point, Rodríguez claims he administered Miranda warnings.

Oquendo's motion was denied following the hearing. The district court reasoned that, because Rodríguez asked Oquendo whether he had a valid gun license during a Terry-type intervention, Oquendo was not in formal custody, making Miranda warnings unnecessary. Even if the gun-licensing question were impermissible, the district court continued, Rodríguez had probable cause for arresting Oquendo, as he brandished a firearm. The district court additionally found that Oquendo spontaneously

made his initial statements ("we're clear . . . both weapons are [ours], but . . . they are not involved whatsoever with the events that occurred at La Tómbola") pursuant to a valid <u>Miranda</u> waiver. With regard to the statements made to Agent Torres, the district court concluded that Oquendo did not assert that he wished to consult with counsel, and that Oquendo voluntarily waived his right to remain silent.

**A.**

This court reviews factual determinations and credibility assessments underlying a motion to suppress for clear error and reviews legal conclusions <u>de novo</u>. <u>Id.</u> at 16. We view the facts in the light most favorable to the district court's ruling on the motion. <u>United States</u> v. <u>Camacho</u>, 661 F.3d 718, 723 (1st Cir. 2011). "So long as 'any reasonable view of the evidence supports it,' [this court] will uphold the denial of the motion to suppress." <u>United States</u> v. <u>Molina-Gómez</u>, 781 F.3d 13, 18 (1st Cir. 2015) (quoting <u>United States</u> v. <u>Brown</u>, 510 F.3d 57, 64 (1st Cir. 2007) (internal quotation marks and citation omitted)).

During a stop pursuant to <u>Terry</u> v. <u>Ohio</u>, 392 U.S. 1 (1968), "officers [may] 'diligently pursue[] a means of investigation . . . likely to confirm or dispel their suspicions quickly.'" <u>United States</u> v. <u>Trueber</u>, 238 F.3d 79, 91-92 (1st Cir. 2001) (quoting <u>United States</u> v. <u>Sharpe</u>, 470 U.S. 675, 686 (1985)).

-9-

However, no bright-line rule exists demarcating Terry-type interventions from arrests. United States v. Rabbia, 699 F.3d 85, 89-90 (1st Cir. 2012). Nevertheless, a detention transforms into a de facto arrest when a reasonable person, in the suspect's position, would feel the degree of restraint normally associated with formal arrest. United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994). The question is, then, whether "in light of the totality of the circumstances . . . a reasonable person in the suspect's position would have understood [his] position 'to be tantamount to being under arrest.'" United States v. Chaney, 647 F.3d 401, 409 (1st Cir. 2011) (quoting Zapata, 18 F.3d at 975).

Upon review, factors to consider include: "the location and duration of the stop, the number of police officers present at the scene, the degree of physical restraint placed upon the suspect, and the information conveyed to the suspect." Rabbia, 699 F.3d at 91. This court also inquires into "whether the suspect was questioned in familiar or at least neutral surroundings . . . and the duration and character of the interrogation." United States v. Nishnianidze, 342 F.3d 6, 13 (1st Cir. 2003) (quoting United States v. Masse, 816 F.2d 805, 809 (1st Cir. 1987)). Officers' temporary use of coercive measures, such as handcuffs, and even drawing a weapon are not dispositive. See United States v. Fornia-Castillo, 408 F.3d 52, 64-65 (1st Cir. 2005). Whether

-10-

a Terry stop escalated to a de facto arrest "'qualif[ies] for independent review' as it . . . presents a 'mixed question of law and fact.'" Trueber, 238 F.3d at 93 (alterations in original) (quoting Thompson v. Keohane, 516 U.S. 99, 113 (1995)).

Once an individual is in custody, police must advise the arrestee of his or her constitutional rights before interrogation. Miranda v. Arizona, 384 U.S. 436, 467-68 (1966). Failure to warn a person of their Miranda rights renders inadmissible any statement elicited in the course of the custodial interrogation. United States v. Jackson, 544 F.3d 351, 356 (1st Cir. 2008).

**B.**

Here, at first glance, the suppression issue as to Oquendo's pre-Miranda statement appears to hinge on this court's independent determination of whether the Terry stop escalated into an arrest before officers asked Oquendo if he had a gun license. Several factors cause concern. The location was secluded. Cf. Berkemer v. McCarty, 468 U.S. 420, 439 (1984) (explaining that "exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse"). Oquendo was placed in handcuffs, which the record does not suggest were removed at any point, and officers did not take measures to ensure

-11-

that Oquendo knew that he was not under arrest.  Cf. Fornia-Castillo, 408 F.3d at 65 (officers removed handcuffs within fifteen minutes and did not admit into evidence statements made by defendant while he remained in handcuffs); see also Rabbia, 699 F.3d at 88-90 (finding that the officer's questioning after removing handcuffs did not convert the initial Terry stop into a custodial arrest).  Nor does the record suggest that Rodríguez informed Oquendo that the handcuffs were a temporary safety measure.  Rabbia, 699 F.3d at 88 (officer informed defendant that he was being handcuffed as a safety measure and would remove the restraints once other officers arrived).  It is also not clear how much time elapsed between apprehension and questioning, and we note that officers moved Oquendo; that Rodríguez pointed his weapon at Oquendo, kept it on him during the chase, and had it in his hand while apprehending him; and that the officers used some force in apprehending Oquendo, "throw[ing]" him on the floor and handcuffing him.[2]  Ultimately, however, no one of these factors is dispositive under our precedent.  We are also keenly aware that they reflect circumstances created by suspects' flight -- the location and nature of setting, for example -- and officers' contextually reasonable responses to the circumstances created by

_____

[2]  As we said in Oquendo-Rivas, "[the officers] grabbed Oquendo and restrained him on the floor."  750 F.3d at 14-15.

-12-

suspects' flight.  See Chaney, 647 F.3d at 409.  There were two officers, but also two suspects.  See Rabbia, 699 F.3d at 89-91 (suggesting consideration of the number of officers involved).  Although the officers did not communicate that the stop and handcuffing were temporary, and Rodríguez referred to it as an arrest when testifying, the record does not suggest that the officers conveyed to the suspects that they were under arrest prior to the Miranda warnings.  United States v. Streifel, 781 F.2d 953, 959 (1st Cir. 1986) ("[Officers'] intentions were relevant only to the extent that they were communicated to the defendants."); see also Trueber, 238 F.3d at 92.  In particular, the brevity of the pre-arrest interrogation -- a single pre-Miranda question -- and its clear relationship to the reason for Oquendo's detention, see Trueber, 238 F.3d at 91-92, as well as his subsequent arrest, might persuade us that this was a Terry-type intervention and did not escalate into a de facto arrest.  Yet we can also imagine how a reasonable person in Oquendo's position might believe he was under arrest.  See Chaney, 647 F.3d at 409.

We find that we need not determine if it was a Terry-style intervention or a de facto arrest, as the admission of the statement was harmless error.  Arizona v. Fulminante, 499 U.S. 279, 284-85 (1991) (affirming harmless-error analysis applies to admission of pre-Miranda statements); Bryant v. Vose, 785 F.2d

-13-

364, 367 (1st Cir. 1986). Rodríguez earlier observed Oquendo "fle[eing] while brandishing a firearm, which he later attempted to dispose," separate grounds for arrest, and one of the firearms recovered had a serial number that had been obliterated. See Oquendo-Rivas, 750 F.3d at 15. Three eyewitnesses identified Oquendo as one of the La Tómbola gunmen. As such, "the admission of [Oquendo's pre-Miranda statement to Rodríguez] did not contribute to [Oquendo's] conviction." Fulminante, 499 U.S. at 296 (citing Chapman v. California, 386 U.S. 18, 26 (1967)).

### c.

We reject Oquendo's credibility-based challenge to his post-Miranda statement to the PRPD officers. He claims that it is implausible that the arrestees spontaneously stated that the weapons were theirs but had nothing to do with the shooting. But the district court deemed Rodríguez's account credible and asserted that the statements "could easily be seen as revealing a guilty conscience." And, as we have elsewhere observed, "'the ball game is virtually over' once a district court determines that a key witness is credible." United States v. Guzmán-Batista, 783 F.3d 930, 937 (1st Cir. 2015) (quoting Rivera-Gómez v. de Castro, 900 F.2d 1, 4 (1st Cir. 1990)). Oquendo did not marshal any "objective evidence that contradicts [Rodríguez's] story" or show that Rodríguez's account was "so internally inconsistent or

-14-

implausible that no reasonable factfinder would credit it." Id. at 937. Rather, Rodríguez's account was uncontroverted. Oquendo has not produced that which would "definitely and firmly convince[] [us] that a mistake has been made," Oquendo-Rivas, 750 F.3d at 16, and so we leave undisturbed the lower court's credibility assessment.

## D.

Stare decisis bars this court from reconsidering the admissibility of Oquendo's post-Miranda statements to Torres. In Oquendo-Rivas, we decided that neither Oquendo's right to remain silent nor his right to counsel had been violated and thus that his motion to suppress was correctly denied. 750 F.3d at 18-19; see EEOC v. Trabucco, 791 F.2d 1, 4 (1st Cir. 1986). None of the criteria for overturning precedent have been met: Oquendo did not show that the issue was not argued or that the previous panel "ignored" the issue -- or that the decision was outdated, inconsistent with current law, or unworkable. Trabucco, 791 F.2d at 4. Rather, his arguments presume this issue has not already been decided. We thus once again uphold the district court's denial of the motion to suppress.

## IV. **The Closure**

The district court ordered a witness who did not appear on the day he was slated to testify against Candelario at trial,

-15-

who had previously testified before the grand jury and been interviewed by agents, arrested and brought to court. On February 27, 2013, at 5:20 p.m., the district court held an in-chambers conference to address the witness's concerns. At the start of the conference, the witness expressed: "I'm afraid, and I fear for my family." Presumably because it sought a more concrete reply, the district court pressed the witness to clarify whom, if anyone, he feared. He replied: "Well, these delinquents, they have family, and. . . I know all of those people . . . I grew up in that neighborhood, and I know how things are done there." The court then informed him: "Are you aware that many other people from your community have come to testify about things they know, and have even identified, rightly or wrongly, some of these people? And nothing has happened to them."

Replying to another question from the district court, the witness indicated that he had received no threats. Immediately thereafter, he clarified, without offering more, that he was known to a person related to Candelario. The reluctant witness confided: "All of our lives we know about the things that have gone on in Sabana Seca, and this is like a chain. And things are still continuing to happen. They continue."

The court then stated:

Look at the alternatives. I'm not telling you this
to scare you. Believe me. I'm not trying to do that.

-16-

But you have to understand that I have an obligation to make certain that matters that pertain to legal process are complied with. And while I cannot force you, I would hate and I would be very sorry if I have to imprison you because of this. And you will have to go to the same Federal jail where all these guys are. Imprisonment for contempt of this nature is you go in and you don't come out until you comply with the Order of the Court.

The court later added, "if you don't leave me an alternative -- can you imagine yourself sleeping tonight in Federal jail with all these guys there?"

In further trying to persuade the witness to testify, the district court assured him that, though the court and counsel knew his identity, the witness's name would not be released to the press. Alternatively, the court offered to assign the witness an alias under which he could testify, but noted that Candelario likely already knew the witness's name:

THE COURT: I can give you a different name, because I am not hiding your name, because the lawyers have it. The lawyers have it. They know who you are. They have your Grand Jury testimony.

THE WITNESS: Yeah, but the attorneys already gave it to [Candelario], didn't they?

THE COURT: I don't know whether they did that, but you don't think [Candelario] knows?

At this point, Government counsel interjected and offered to re-locate the witness. Later, the district court offered the witness "protection." The witness turned down both offers.

-17-

As negotiations continued, the district court devised a plan where the court security officers would announce to the public that the court was adjourning for the day. The court, however, would then resume with the witness's testimony once the courtroom was vacated. Additionally, the lower court would allow the witness to face away from Candelario, and to identify him using a photograph. The plan went through, over the objections of counsel for Candelario.

**A.**

As Justice Black once observed, "[b]ad men, like good men, are entitled to be tried and sentenced in accordance with law . . . ." Green v. United States, 365 U.S. 301, 309 (1961) (Black, J., dissenting); see also Sorich v. United States, 129 S. Ct. 1308, 1311 (2009) (Scalia, J., dissenting) (mem.).

We begin with the troubling question of whether the district court's closing feint to facilitate the reluctant witness's testimony constituted a constitutionally impermissible closure, effecting structural error. We find that, in Candelario's case, it did.[3] As such, we need not proceed to the further question

---

[3] Counsel for Oquendo expressly waived any public trial claim by affirmatively stating, in reply to the district judge's inquiry as to his consent to the closing, "I don't mind." See United States v. Christi, 682 F.3d 138, 142 (1st Cir. 2012) (finding that where defense counsel failed to speak while judge discussed closure "her silence passed beyond inadvertence or passivity to the point of

whether the district court's statements to the witness regarding the consequences of refusing to testify were coercive.

This court reviews de novo whether a district court violated a defendant's Sixth Amendment right to a public trial. United States v. Laureano-Pérez, 797 F.3d 45, 76 (1st Cir. 2015). The Sixth Amendment affords defendants the right to a public trial. U.S. Const. amend. VI. This constitutional guarantee "embodies a view . . . that judges, lawyers, witnesses, and jurors will perform their respective functions more responsibly in an open court than in secret proceedings." Waller v. Georgia, 467 U.S. 39, 46 n.4 (1984) (quoting Estes v. Texas, 381 U.S. 532, 588 (1965) (Harlan, J., concurring)). Denial of a public trial constitutes structural error, United States v. Negrón-Sostre, 790 F.3d 295, 301 (1st Cir. 2015), rendering the entire trial process "fundamentally unfair," Neder v. United States, 527 U.S. 1, 8 (1999) (quoting Rose v. Clark, 478 U.S. 570, 577 (1986)). Given the magnitude of this error, a defendant need not demonstrate prejudice. Owens v. United States, 483 F.3d 48, 63 (1st Cir. 2007). "The mere demonstration that [a defendant's] right to a public trial was violated entitles a petitioner to relief." Id. (citation and internal quotation marks omitted).

---

waiver").

The right to a public trial is not absolute, however. Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. 596, 606 (1982). It "may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." Waller, 467 U.S. at 45. "Such circumstances will be rare, however, and the balance of interests must be struck with special care." Id. In Waller, the Supreme Court established a four-pronged test for evaluating the constitutionality of courtroom closures:

> the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

Id. at 48. Complete closures are justified to the extent that all four requirements are satisfied. Id.

"The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." Press-Enter. Co. v. Superior Court of Cal., Riverside Cnty., 464 U.S. 501, 510 (1984). In such cases, "[t]he interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was

-20-

properly entered." Id.; see also Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 581 (1980) ("Absent an overriding interest articulated in findings, the trial of a criminal case must be open to the public." (emphasis added)).

The Clemente Ruiz Nazario U.S. Courthouse closes its doors to the public at 5 pm. See Court Locations, U.S. District Court for the District of Puerto Rico, http://www.prd.uscourts.gov/?q=court-locations; see generally 41 C.F.R. § 102-74.375(a) ("Except as otherwise permitted, [federal agencies must] close property to the public during other than normal working hours."). Although the doors to the actual courtroom remained unlocked, the announcement that the court was adjourning, the attorneys' feint at packing up, and the after-hours time at which the court reconvened effected a closure. See, e.g., Walton v. Briley, 361 F.3d 431, 433 (7th Cir. 2004) (finding complete closure where two proceedings "encompassing the entirety of the prosecution's" case-in-chief took place during late evening hours (quoting United States ex. rel. Walton v. Gilmore, 2001 WL 709463, *1 (N.D. Ill. June 25, 2001)). Because nothing in the record suggests that any part of the proceeding remained open or any members of the public remained, it was a complete closure. Cf. Wilder v. United States, 806 F.3d 653, 660-61 (1st Cir. 2015), cert. denied, 136 S. Ct. 2031 (2016) (finding that procedures that

-21-

are the functional equivalent of sidebar conferences do not constitute complete closure); Bucci v. United States, 662 F.3d 18, 23 (1st Cir. 2011). Far from inadvertent, the closure here was deliberate. See Negrón-Sostre, 790 F.3d at 305. Moreover, it encompassed the entirety of one witness's testimony, the presentation of evidence. Cf. United States v. Bucci, 525 F.3d 116, 130 (1st Cir. 2008) (noting that the fact that "no evidence was presented against either defendant" weighed in favor of excusing closure during civil contempt proceedings related to criminal trial).

The closure fails the Waller test at the first prong: The Government did not request a closure nor did the Government or the court identify an overriding interest, much less establish that it was "likely to be prejudiced." See, e.g., Laureano-Pérez, 797 F.3d at 77 (finding "substantial interest" for exclusion where a member of the public made faces and mouthed words at a witness in an intimidation attempt); see also Martin v. Bissonette, 118 F.3d 871, 876 (1st Cir. 1997) (no error in excluding defendant's family members who "played prominent roles in menacing a witness"); United States v. Addison, 708 F.3d 1181, 1187-88 (10th Cir. 2013) (no error in excluding a person who "intimidated" a government witness); United States v. Hernández, 608 F.2d 741, 748 (9th Cir. 1979) (affirming closure where witness received menacing phone

calls and informing law enforcement that a contract "had been put out on his life"). The district court articulated no findings to that effect. To the contrary, at different points in its exchange with the witness, the district court made clear its belief that closure would not protect the witness or his identity.[4] While we can imagine a scenario with somewhat similar facts in which the district court instead acknowledged and inquired into the witness's concerns, formally found an "overriding interest" likely to be prejudiced, explored alternatives to closure in full, and narrowly tailored some form of closure to protect that overriding interest, resulting in a constitutionally permissible closure, that is not what occurred here. Waller, 467 U.S. at 48; Press-Enter. Co., 464 U.S. at 510; Richmond Newspapers, Inc., 448 U.S. at 581. On this record, given the district court's statements undermining the witness's concerns and the absence of any finding of an overriding interest, we cannot find that the closure in this

_____

[4] The court stated, "Well, [Candelario] already knows that you testified," and asked, "but you don't think he knows [your name]?" When asked if he was afraid of "[a]ny particular person," the witness responded, "[n]o," and expressed a generalized fear of people associated with Candelario. The district court asked, "Are you aware that many other people from your community have come to testify about things they know, and have even identified, rightly or wrongly, some of these people?" He added, "And nothing has happened to them," apparently discrediting the notion that the witness would be put at risk if he testified before the public.

case was constitutionally permissible and must vacate and remand as to Candelario.

### V. Oquendo's Assorted Allegations of Error

Oquendo alleges that the district court erred by failing to sua sponte sever his trial from Candelario's and that the Government committed prosecutorial misconduct in its closing statements. Because Oquendo neither articulated the severance issue below nor objected to the alleged prosecutorial misconduct, this court reviews his claims for plain error. United States v. Richardson, 515 F.3d 74, 83 (1st Cir. 2008); United States v. Robinson, 473 F.3d 387, 396 (1st Cir. 2007). "Plain error review puts a heavy burden on the defendant; he must show '(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings.'" United States v. Laracuent, 778 F.3d 347, 349 (1st Cir. 2015) (quoting United States v. Negrón–Narváez, 403 F.3d 33, 37 (1st Cir. 2005)).

### A.

We first address Oquendo's belated objection to joinder. The risk of spillover prejudice does provide a basis for requesting severance under criminal rule 14(a). Fed. R. Crim. P. 14(a) (a court "may order separate trials" or "sever the defendants' trials"

-24-

if "the joinder of. . . defendants in an indictment. . . or a consolidation for trial appears to prejudice a defendant or the government"). But "severance [is] warranted 'only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" United States v. Tiem Trinh, 665 F.3d 1, 17-18 (1st Cir. 2011) (quoting United States v. Celestin, 612 F.3d 14, 19 (1st Cir. 2010)). "To establish prejudice, [defendant] must show more than just a better chance of acquittal at a separate trial." Id. at 19 (citation and internal quotation marks omitted). "Garden variety prejudice, which always exists when more than one defendant or offense are tried together, does not warrant a new trial." Id. (quoting United States v. Tejeda, 481 F.3d 44, 55 (1st Cir. 2007)). Moreover, a trial court can safeguard a defendant from potentially prejudicial spillover by delivering jury instructions as to the admissibility of the evidence. United States v. Floyd, 740 F.3d 22, 37 (1st Cir. 2014). "[A] death-qualified jury constitutionally may hear and determine non-capital charges" insofar as "significant interests" justify trying capital and non-capital defendants jointly. United States v. Green, 407 F.3d 434, 444 (1st Cir. 2005) (citing Buchanan v. Kentucky, 483 U.S. 402, 420 (1987)).

We find that the district court did not err in declining to sua sponte sever Defendants-Appellants' trials before a death-qualified jury.[5]  At trial, the Government established one of the VICAR elements -- e.g., the existence of an ongoing enterprise -- primarily through former associate Menor's often vivid testimony regarding Candelario's antecedent offenses.  Even assuming, arguendo, that the Government presented irrelevant and potentially prejudicial testimony, the district court repeatedly delivered limiting instructions to the jury.  Moreover, the court instructed the jury to render a guilty verdict as to each defendant only if the Government proved each element beyond a reasonable doubt as to the defendant.  These curative instructions insulated Oquendo from any potential harm.  Floyd, 740 F.3d at 37.  Oquendo's garden variety allegations of unfair prejudice are further negated by the overwhelming direct and circumstantial evidence against him, including the three eyewitnesses who identified him as one of the La Tómbola shooters.

---

[5]  Oquendo cites no case law nor articulates any legal basis in support of his severance claim.  Furthermore, Oquendo does not dispute that the instant case qualified for joinder.  Nor does he challenge on constitutional grounds the empanelling of a death-qualified jury to try his non-capital charges.  Because he cannot establish plain error, we affirm the lower court's decision to try defendants jointly before a death-qualified jury.

Oquendo objects for the first time on appeal to the Government's statements in closing to the effect that Oquendo and Candelario knew one another; referring to Oquendo as "blindly loyal" and "somebody . . . who is easily led"; describing the victims of the shooting as having been "killed like dogs"; and urging the jury to "put an end to Alexis'[s] war."

To obtain reversal on the basis of prosecutorial misconduct, a defendant must show that the actions of the Government "so poisoned the well that the trial's outcome was likely affected." United States v. Vázquez-Larrauri, 778 F.3d 276, 283 (1st Cir. 2015) (quoting United States v. Kasenge, 660 F.3d 537, 542 (1st Cir. 2011)). Put another way, a defendant must establish that the errors "likely swayed the outcome of the trial." United States v. Báez-Martínez, 786 F.3d 121, 125 (1st Cir. 2015), rev'd on other grounds, 136 S. Ct. 545 (2015). Factors to be weighed in this analysis include: "(1) the severity of the prosecutor's misconduct, including whether it was deliberate or accidental; (2) the context in which the misconduct occurred; (3) whether the judge gave curative instructions and the likely effect of such instructions; and (4) the strength of the evidence against the defendants." United States v. Nelson–Rodríguez, 319

F.3d 12, 38 (1st Cir. 2003) (quoting United States v. Wihbey, 75 F.3d 761, 771-72 (1st Cir. 1996)) (quotation marks omitted).

Regarding claims of misstatement of evidence, "[t]o determine whether the prosecutor's misstatement amounted to plain error, it must be viewed within the context of the entire trial." United States v. Santana-Camacho, 833 F.2d 371, 373 (1st Cir. 1987). "[T]he court must consider the probable effect the prosecutor's [remarks] would have on the jury's ability to judge the evidence fairly." Id. (alterations in original) (citation omitted). This court has previously found plain error from misstatement of the evidence when, for example, "the prosecutor made a remark that 'was not made in response to any improper statement made by the defense counsel[,] . . . lacked any basis in the evidence[,] and . . . contradicted the evidence.'" United States v. Nickens, 955 F.2d 112, 123 (1st Cir. 1992) (quoting Santana-Camacho, 833 F.2d at 375). We take no issue, however, with the efforts of a prosecutor to "attempt to persuade the jury to draw inferences from the evidence" in closing arguments. United States v. O'Shea, 426 F.3d 475, 485 (1st Cir. 2005) (quoting United States v. Hamie, 165 F.3d 80, 84 (1st Cir. 1999)).

In assessing whether reversal is warranted under the cumulative-error doctrine, this court evaluates whether "[i]ndividual errors, insufficient in themselves to necessitate a

new trial, may in the aggregate have a more debilitating effect." Laureano-Pérez, 797 F.3d at 79 (alteration in original) (quoting United States v. Sepúlveda, 15 F.3d 1161, 1195-96 (1st Cir. 1993)). Of course, "[a]bsent any particularized error, there can be no cumulative error." Williams v. Drake, 146 F.3d 44, 49 (1st Cir. 1998).

In the instant case, no plain error resulted from the prosecutor's purported misstatement of the evidence. A reasonable jury could infer that Oquendo and Candelario knew one another, based on Rufo's testimony. O'Shea, 426 F.3d at 485. Similarly, the purported "calls to speculation" do not rise to the level of plain error. For example, by exhorting the jury to conclude that Oquendo was "blindly loyal" to Candelario, the prosecutor merely, albeit colorfully, urged an inference supported by evidence of Oquendo's participation in the La Tómbola shooting. Id.

Even if either statement constituted an error, neither changed the trial's outcome. Báez-Martínez, 786 F.3d at 125; Vázquez-Larrauri, 778 F.3d at 283. Given the weight of the evidence, there is no substantial chance that absent the purported misstatement the jury would have acquitted. Arrieta-Agressot v. United States, 3 F.3d 525, 528 (1st Cir. 1993). We note once more at this juncture that three eyewitnesses identified Oquendo as one of the perpetrators of the La Tómbola shooting.

-29-

During the prosecution's rebuttal, the Government also urged the jury to "put an end to Alexis'[s] war." By itself, this statement is not tantamount to an appeal to convict as a civic duty. Moreover, these comments fall well short of the ignoble benchmark set by other remarks we have nonetheless declined to find constituted plain error. See, e.g., Sepúlveda, 15 F.3d at 1188 n.21 ("We put this organization out of business. And it's up to you to decide that it stays that way. Because ask yourselves, the business practices of this organization, this organized group of drug dealers, what practices will be allowed to continue in the streets of Manchester and the surrounding towns of New Hampshire if these people are allowed or permitted to revive the drug ring . . . ."). Likewise, we find that the Government did not improperly appeal to the jury's passion. The prosecution's characterization of Candelario's actions as "war" finds footing in the record. Indeed, Rufo's testimony referred to the conflicts between members of Palo de Goma as a "war." Lastly, we do not find plain error resulted from the prosecution's vivid description of the La Tómbola shooting: The phrase "killed like dogs," may be distasteful, but it is hardly plain error.

In conclusion, we find Oquendo has not carried the burden of establishing that the prosecution's summation "likely swayed the outcome of the trial," Báez-Martínez, 786 F.3d at 125, nor

demonstrated some series of errors creating cumulative error requiring reversal. Laureano-Pérez, 797 F.3d at 79; Drake, 146 F.3d at 49.

## VI.  The Jury Instructions

Oquendo argues that the district court plainly erred when it failed to convey that the jury should render a verdict of guilty only if Oquendo "acted with a purpose to further or benefit from an ongoing conspiracy," as charged in the indictment. According to Oquendo, "[t]he Court's instructions, taken as a whole, authorized [Oquendo's] conviction for the offense of aiding and abetting in a murder or attempted murder under the laws of Puerto Rico or 18 U.S.C. § 1841 (Count 10) rather than in the VICAR offense charged in the indictment." Oquendo also complains that the instructions violated his due process rights by allowing a conviction on the basis of speculation. In this regard, Oquendo maintains that the instructions required the Government to prove that Oquendo acted to benefit from or in furtherance of an enterprise that, inter alia, "existed or would exist" and that the conduct "posed or would pose a threat of continued criminal activity." Per United States v. Patrick, 248 F.3d 11 (1st Cir. 2001), he argues, the enterprise need be ongoing at the time of the charged conduct. With regard to the VICAR instructions, he claims, the district court "fail[ed] to make clear the critical

-31-

element of knowledge of enterprise-related motive." Lastly, Oquendo protests that while the indictment charged Oquendo in the conjunctive (acting "for either receipt of payment by the enterprise and to gain, maintain or increase position in it"), the district court conveyed instructions in the disjunctive.

## A.

As Oquendo failed to object to any of the jury instructions he now challenges, this court reviews his claims for plain error. United States v. López-Díaz, 794 F.3d 106, 117 (1st Cir. 2015). That is, his claims of instructional error are forfeit unless he can establish plain error. United States v. Gómez, 255 F.3d 31, 37 (1st Cir. 2001). "When applying the plain error standard in the context of jury instructions, [this court] look[s] at the instructions as a whole to ascertain the extent to which they adequately explain the law without confusing or misleading the jury." United States v. Fermin, 771 F.3d 71, 80 (1st Cir. 2014) (quoting United States v. Brown, 669 F.3d 10, 29 (1st Cir. 2012)) (internal quotation marks omitted).

## B.

We find that, taken "as a whole," Fermin, 771 F.3d at 80, the jury instructions adequately apprised the jury of the necessary elements to convict Oquendo of aiding and abetting Candelario's VICAR offense.

The district court explained that to establish "aiding and abetting" the Government had to prove that "[Oquendo] consensually shared [Candelario's] knowledge of the underlying criminal act." Immediately following these instructions, the court clarified that the Government was tasked with proving that the "[aforementioned] underlying criminal conduct was committed" pursuant to an enterprise-related purpose. Although the district court's articulation of the "ongoing enterprise" requirement was admittedly problematic, the jury instructions, viewed in their entirety, adequately explained the law, as the court also clarified the structural features of an enterprise. Cf. Brown, 669 F.3d at 29-30 (finding no plain error where jury instructions included "questionable articulations" but later clarified the law). For the same reason, we find that the district court did not err when it advised the jury that the prosecution could establish the VICAR-related purpose (i.e. carrying out the act "in receipt of payment" or "to gain entrance to" the enterprise) in the disjunctive, though the indictment charged Defendants-Appellants in the conjunctive.[6] Finally, the district court did not err when it advised the jury

---

[6] We note that this issue is in any case likely waived, as Oquendo does not develop this argument fully. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

that the VICAR motive "need not be the sole or principal motive":
The instruction in question is consistent with our holding in
United States v. Tse. 135 F.3d 200, 206 (1st Cir. 1998).

## VII.  Sufficiency of the Evidence

Finally, Oquendo argues that the evidence is
insufficient to support his convictions, and that his Fed. R. Crim.
P. 29 motion for acquittal should have been granted.  This
argument, too, fails to persuade us.

This court reviews de novo a district court's denial of
a motion for judgment of acquittal under Fed. R. Crim. P. 29.
United States v. Alberico, 559 F.3d 24, 27 (1st Cir. 2009).  Such
a motion will only be "granted if 'the evidence and all reasonable
inferences to be drawn from the evidence, both taken in the light
most favorable to the [G]overnment, are insufficient for a rational
fact finder to conclude that the prosecution has proven, beyond a
reasonable doubt, each of the elements of the offense.'"  Id.
(quoting United States v. Pimental, 380 F.3d 575, 583 (1st Cir.
2004)).

"An appellate court plays a very circumscribed role in
gauging the sufficiency of the evidentiary foundation upon which
a criminal conviction rests. [We] neither weigh[] the credibility
of the witnesses nor attempt[] to assess whether the prosecution
succeeded in eliminating every possible theory consistent with the

defendant's innocence." United States v. Medina-Martínez, 396 F.3d 1, 5 (1st Cir. 2005) (quoting United States v. Noah, 130 F.3d 490, 494 (1st Cir. 1997)). Instead, this court analyzes whether, through the lens of a rational trier of fact, "the evidence presented at trial, together with all reasonable inferences, viewed in the light most favorable to the government, established guilt." United States v. Strong, 724 F.3d 51, 60 (1st Cir. 2013) (citation and quotation marks omitted). "The court's only inquiry is whether the guilty verdict is supported by a plausible rendition of the record." United States v. Rodríguez-Reyes, 714 F.3d 1, 7 (1st Cir. 2013) (citation and quotation marks omitted). We note that, in particular, the findings of a jury should be left undisturbed where the evidence, along with all inferences reasonably derived therefrom, suffice to establish guilt beyond a reasonable doubt. Medina-Martínez, 396 F.3d at 5; United States v. Bruno, 383 F.3d 65, 82 (2d Cir. 2004).

Viewing the evidence presented at trial in the light most favorable to the Government, and drawing all rational inferences accordingly, Alberico, 559 F.3d at 27, we have little trouble concluding that a rational trier of fact could find beyond a reasonable doubt that the Government proved the VICAR elements at issue.

## A.

VICAR prohibits murder and other violent crimes "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a). As we and other circuits have elsewhere recognized, Congress intended the motive requirement to be construed liberally. United States v. Concepción, 983 F.2d 369, 381 (2d Cir. 1992); see Tse, 135 F.3d at 206 (citing Concepción favorably). The Government need not prove that a defendant committed the violent act solely or principally for the purpose of gaining entrance to the enterprise. See Tse, 135 F.3d at 206. An "enterprise" refers to "any union or group of individuals associated in fact . . . which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1959 (b)(2). The enterprise must be "ongoing" and have "existed in some coherent and cohesive form." United States v. Nascimento, 491 F.3d 25, 32 (1st Cir. 2007) (internal quotation marks and citations omitted). Although members can enter and exit the enterprise, it "must continue in an essentially unchanged form during substantially the entire period alleged in the indictment." Patrick, 248 F.3d at 17.

**B.**

Here, the enterprise continued, albeit with multiple changes in leadership, from 1993 through 2009. Over that period, Palo de Goma exhibited a well-organized structure; sold the same drugs; and killed members of rival enterprises. Although Palo de Goma did not exhibit all distinguishing traits traditionally associated with gangs -- such as gang colors and initiation rites, see, e.g., Patrick, 248 F.3d at 17 -- the facts nonetheless support finding the cohesive structure and sufficient degree of sophistication to establish the elements of an enterprise. See Nascimento, 491 F.3d at 33 (enterprise "lacked some of the accouterments of more structured street gangs" yet was "sufficiently well-defined" to constitute an enterprise). And while, admittedly, the upper ranks of the organization shifted over time due to internal disputes, the succeeding members functioned as a continuous unit, working together toward a common purpose. See Patrick, 248 F.3d at 17 (affirming jury instruction that "although individuals may come and go, the enterprise must continue in an essentially unchanged form").

With regard to motive, the Government presented evidence that Candelario murdered past rivals, some within the enterprise; Defendants-Appellants carried out the attack; and Candelario shared the purpose of his prior murders with those who carried out

attacks for and with him. These circumstances, in conjunction with Candelario's death threats to Rufo over his refusal to continue sharing Palo de Goma drug revenue, supported the finding that Candelario's motive was to reassert his role in the enterprise and that Oquendo shared his motive.[7] As such, we are satisfied that, viewed in its entirety and in the light most favorable to the Government, the record contains sufficient evidence for the jury to have plausibly found beyond a reasonable doubt that Candelario carried out the La Tómbola shooting "for the purpose of gaining entrance to" the enterprise, 18 U.S.C. § 1959(a), and Oquendo knew of and shared that purpose. Rodríguez-Reyes, 714 F.3d at 7. The jury's findings stand. Medina-Martínez, 396 F.3d at 5.

---

[7] At trial, the Government employed overlapping evidence, mostly through Menor's testimony of predicate murders, to prove the "enterprise" and "pattern of racketeering activity" elements. While the pattern of racketeering activity does not necessarily establish the existence of an enterprise "separate and apart" from the activities themselves, United States v. Turkette, 452 U.S. 576, 583 (1981), the evidence may intersect in some cases. Boyle v. United States, 556 U.S. 938, 947 (2009). Because the evidence showed that Palo de Goma members performed at least some racketeering activity to advance a goal beyond the underlying criminal activity itself (e.g., eliminating members of rival drug points), see Nascimento, 491 F.3d at 32, the evidence of both elements demonstrated that members worked together to maintain or advance Palo de Goma's position as a drug point.

## VIII.  <u>Conclusion</u>

For the reasons set forth above, we affirm Oquendo's convictions but vacate those of Candelario and remand for proceedings consistent with this opinion.

**<u>Affirmed, Vacated and Remanded</u>.**