In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-3112

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DEANGELO ANDERSON,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:14-cr-00186-LA — **Lynn Adelman**, *Judge.*

ARGUED NOVEMBER 7, 2017 — DECIDED FEBRUARY 2, 2018

Before EASTERBROOK, ROVNER, and HAMILTON, *Circuit Judges*.

ROVNER, *Circuit Judge.* On September 23, 2014, a grand jury returned a five-count indictment against Deangelo Anderson, charging him in counts one and two with armed robbery of a bank and brandishing a firearm in furtherance of a crime of violence (i.e. the bank robbery), and in counts three, four and

five with unlawful possession of a firearm as a felon, possession of crack cocaine with intent to distribute, and possession of a firearm in furtherance of a drug trafficking offense. He was tried before a jury on April 4 and 5, 2016, and on April 5 the jury returned a verdict acquitting him of counts one and two, and convicting him of counts three, four and five. The district court sentenced him to 96 months' imprisonment, comprised of 36 months on counts three and four, to be served concurrently, and sixty months on count five, to be served consecutively to the sentence on counts three and four.

Anderson now appeals that conviction and sentence to this court. He argues that he is entitled to a new trial because he was denied his Sixth Amendment right to a public trial when the proceedings continued beyond the hours when the courthouse was open. In addition, he contests his sentence, asserting that the district court based his sentence on an erroneous understanding of the law.

The facts underlying Anderson's conviction are largely irrelevant to the disposition of his claims in this appeal, and therefore we limit our discussion to a brief recap. On August 12, 2014, three masked individuals robbed a bank at gunpoint in Milwaukee, Wisconsin, and fled with $4,737 in a white Honda Civic with license plates 480-TNG. The next day, Milwaukee police officers stopped that vehicle, of which Deangelo Anderson was the driver and sole occupant. When the officer approached the vehicle, Anderson fled in the car and was pursued at high speed until he crashed into another vehicle. He was eventually taken into custody, and a search of the Civic revealed a bag containing 39 individually-wrapped baggies of crack cocaine and a loaded 9mm pistol, as well as

red dye stains consistent with a dye pack planted with the stolen money to explode.

The trial began on April 4, 2016, and concluded with a jury verdict on April 5. After the verdict, Anderson filed a motion for a new trial based on a claim that the trial court violated his Sixth Amendment right to a public trial by allowing the trial to proceed on both days beyond the time at which the courthouse was locked for the night. The court denied the motion, and Anderson appealed.

The first day of trial included jury selection, opening statements, and the testimony of thirteen witnesses. Specifically, the government solicited the testimony of: two employees from the bank that was robbed; a citizen witness who discovered dye-stained money on the street; a detective who investigated the robbery; four police officers involved in the chase, stop, and arrest of Anderson and the seizure of evidence from his vehicle; a detective who interviewed Anderson after his arrest; a forensic investigator who took photographs and recovered dye samples from Anderson's vehicle; a detective involved in the recovery of dye-stained money who also directed the forensic examiner's work as to Anderson's vehicle; a forensic scientist who tested the dye evidence; and a forensic investigator who processed the fingerprints and DNA as to the firearm and plastic bag seized from Anderson's car. The testimony of the last three witnesses extended beyond the 5:00 p.m. time at which the doors to the courthouse—but not to the courtroom—were locked. The detective's testimony, which regarded chain-of-custody matters, began at 4:58 p.m. and ended at 5:21 p.m. He was followed by a forensic scientist, who testified from 5:22 p.m. to 5:34 p.m. confirming that dye stains

in the Honda Civic contained chemicals commonly associated with bank dye packs. Finally, the forensic investigator who concluded the testimony for the day, testified on direct and cross-examination from 5:38 p.m. to 6:18 p.m. regarding his unsuccessful efforts to locate fingerprints and obtain DNA from the firearm, ammunition and crack cocaine baggies recovered from Anderson's vehicle. Prior to the testimony of each of the last two witnesses, the trial court held side-bar conferences, but no objection to the testimony was raised at those times.

On the following day, the government presented the testimony of seven additional witnesses, and the court also entertained closing arguments, followed by the jury instructions, deliberations, and verdict. All of the witnesses testified before 5:00 p.m. Closing arguments by the government began at 4:01 p.m. and concluded at 4:38 p.m. The defense commenced its closing arguments at 4:39 p.m., finishing at 5:21 p.m. The government rebuttal occurred from 5:22 p.m. until 5:38 p.m., and the court instructed the jury immediately afterward. The jury retired to deliberate at 6:09 p.m., but the court briefly went on record at 6:40 p.m. and again at 7:56 p.m. to address notes from the jury. The jury reported a verdict at 9:16 p.m., and was discharged at 9:20 p.m.

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. Amend. VI. Public trials are viewed as preserving the integrity of the justice system, by deterring the use of the courts as a means of persecution, encouraging unknown witnesses to come forward, preventing perjury, and imbuing the proceed-

ings with the gravitas and sense of responsibility that facilitates a just process. See *Walton v. Briley*, 361 F.3d 431, 432 (7th Cir. 2004). A violation of the right to a public trial is a structural error, and therefore if objected to at trial, can be reversed without any need to show prejudice. *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1907 (2017).

Anderson did not object at trial to the continuation of proceedings beyond 5:00 p.m. Although the government argues that Anderson thereby waived the argument, the district court made no findings as to whether Anderson or his counsel was aware that the courthouse would be locked at 5:00 p.m. At least as to the first day of trial, that awareness is not obvious from the record, and therefore the issue is not waived. By the second day of trial, however, Anderson's counsel would have been aware that the courthouse was locked. The security guard had to unlock the door to allow the jury and defense counsel to leave at the close of proceedings at 6:18 p.m. on the first day of trial, and when defense counsel had to leave the courthouse to fulfill his civic obligation to vote on the second night, the guard had to let him out of the building and back into it. Nevertheless, no objection was made during the trial. Anderson alleges on appeal that, despite the failure to object, automatic reversal is required because the error is structural and was raised in the trial court in a post-trial motion.

We agree with the government that the plain error standard set forth in Federal Rule of Criminal Procedure 52(b) applies in this case. Under the plain error standard, "an appellate court may, in its discretion, correct an error not raised at trial only where the appellant demonstrates that (1) there is an error; (2) the error is clear or obvious, rather than subject to reason-

able dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Marcus*, 560 U.S. 258, 262 (2010) (internal quotation marks omitted).

The Supreme Court in *Johnson v. United States*, 520 U.S. 461, 466 (1997), held that the plain error standard applied to errors for which no objection was made at trial, including structural errors. Numerous other courts have applied the plain error standard to unpreserved claims that the defendant was denied the right to a public trial. See *United States v. Negron-Sostre*, 790 F.3d 295, 301 (1st Cir. 2015); *United States v. Cazares*, 788 F.3d 956, 966 (9th Cir. 2015); *United States v. Gomez*, 705 F.3d 68, 74–75 (2d Cir. 2013). That determination is consistent with the plain language of Rule 52(b), and prevents the subversion of the trial process that would result if an unpreserved structural error were interpreted as guaranteeing an automatic reversal. In such a scenario, defense counsel would have an incentive to ignore the error and allow the trial to proceed to conclusion, with the knowledge that the defendant has a free pass to a new trial if the outcome is not favorable. As the Supreme Court recognized, "the contemporaneous-objection rule prevents a litigant from 'sandbagging' the court—remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor." *Puckett v. United States*, 556 U.S. 129, 134 (2009). In addition, a court not apprised of a potential error during trial is deprived of the opportunity to correct its mistake and provide a trial that conforms with the Constitution. *Id*. Rule 52(b) eliminates those dangers by

requiring the defendant to demonstrate plain error to obtain relief on unpreserved errors, and it applies to structural errors as well.

That said, there is a question as to whether the third prong of the plain error test is met automatically in cases of structural error. That prong requires that "the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings," and therefore is analogous to the harmless error standard which is inapplicable to preserved claims of structural errors. Structural errors are the type of errors that can be corrected on appeal regardless of their effect on the outcome. *United States v. Cotton*, 535 U.S. 625, 632 (2002). The Supreme Court repeatedly has reserved the question as to whether structural errors affect substantial rights under that test regardless of any actual impact on the trial. See *Marcus*, 560 U.S. at 263; *Puckett*, 556 U.S. at 140; *Cotton*, 535 U.S. at 632. We need not decide that question here, because even assuming that the third prong is met, Anderson cannot demonstrate plain error because he fails under the first two prongs of the test, in that he cannot establish a clear and obvious error that violates the Sixth Amendment.

The Sixth Amendment right to a public trial is not an absolute one that forbids any exclusion of spectators regardless of context. In fact, courts have upheld the closure of the courtroom in a number of circumstances, such as where security or safety concerns require it. *Peterson v. Williams*, 85 F.3d 39, 42 (2d Circuit 1996); *Presley v. George*, 558 U.S. 209, 213–15 (2010). Moreover, we have recognized that some exclusions of spectators from a trial simply do not rise to the

level of a violation of the right to public trial. *Braun v. Powell*, 227 F.3d 908, 918 (7th Cir. 2000). As we noted in *Braun* (adopting the approach of *Peterson*), this triviality standard differs from a harmless error assessment:

> A triviality standard, properly understood, does not dismiss a defendant's claim on the grounds that the defendant was guilty anyway or that he did not suffer "prejudice" or "specific injury." It is, in other words, very different from a harmless error inquiry. It looks, rather, to whether the actions of the court and the effect that they had on the conduct of the trial deprived the defendant—whether otherwise innocent or guilty—of the protections conferred by the Sixth Amendment.

*Braun*, 227 F.3d at 918, quoting *Peterson*, 85 F.3d at 42. In assessing whether a closure rises to the level of a Sixth Amendment violation, we consider the extent to which the closure implicates the values underlying the public trial right: "(1) to ensure a fair trial; (2) to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions; (3) to encourage witnesses to come forward; and (4) to discourage perjury." *Peterson*, 85 F.3d at 43, citing *Waller v. Georgia*, 467 U.S. 39, 46–47 (1984); *Braun*, 227 F.3d at 918. A trivial violation that does not run afoul of those values will not present a Sixth Amendment violation.

Anderson acknowledges those principles, but argues that his case is governed by our decision in *Walton*, in which we found a violation of the right to a public trial, and he urges the

same result here. 361 F.3d 431. In *Walton*, the trial court conducted the first two sessions of the trial, encompassing the entirety of the prosecutor's case, after the courthouse had been closed and locked for the night. *Id*. at 432. The proceedings may have lasted until after 10:30 p.m. *Id.* at 433. There was no question as to whether that action resulted in the exclusion of spectators from the trial. Walton's fiancée twice attempted to attend his trial and was prevented from doing so, and a confidential informant involved in the case was similarly unable to attend the trial as a result of the locked courthouse. *Id*. at 432. The district court found that the lateness of the hour foreclosed the attendance of the public for the first two sessions and that the entirety of the prosecutor's evidence was thereby closed to the public. *Id*. at 433. We held that those factual findings were not clearly erroneous, and were sufficient to demonstrate a violation of Walton's right to a public trial. *Id*.

That case is starkly different than the one before us. The district court in that case found that the entire presentation of evidence by the prosecution occurred at a time in which the public was not allowed to access the courtroom, and that individuals who sought to attend were excluded. A trivial exclusion is one that is limited in duration and scope, and the exclusion in *Walton* was neither.

The *Walton* court explicitly recognized that the result might be different in a situation such as is presented here. The *Walton* court addressed *United States v. Al-Smadi*, 15 F.3d 153, 154 (10th Cir. 1994), in which "the court was closed to the public simply because the trial, which started when the courthouse was still open, ran late," and held that "we make no finding as to

whether or not the facts in *Al-Smadi* would constitute a Sixth Amendment violation in this Circuit." *Walton*, 361 F.3d at 433 n.1. That issue was therefore reserved in *Walton*, not preordained by it.

In contrast to the facts in *Walton*, here there was no total exclusion of spectators from the court, nor did the locking of the courthouse impact a significant portion of the case. The doors of the courthouse were locked at 5:00 p.m. as part of the security measures for the courthouse. The doors to the courtroom itself remained open, and any persons who were in the building prior to 5:00 p.m. could attend the trial in its entirety. Nor did the lateness of the hour render that unlikely. On the first day of the trial, the testimony extended for just over an hour past 5:00 p.m., terminating at 6:18 p.m. Although Anderson points to the testimony of three witnesses that extended beyond 5:00 p.m. that day, the testimony of the first witness began prior to 5:00 p.m. and ended at 5:21 p.m. Anyone wishing to be present for that testimony could have heard it by arriving when that testimony began at 4:58 p.m. Potential spectators arriving after 5:00 p.m. would have heard little of the testimony regardless, as they would have to navigate the normal courthouse electronic security and proceed to the courtroom, and the testimony ended at 5:21 p.m. The only potential impact was on the ability to attend the testimony of the forensic witnesses who testified from 5:22 p.m. to 6:18 p.m., and Anderson does not even argue that their testimony concerning the chemicals used in dye packs and the inability to obtain fingerprint or DNA evidence was a significant part of the trial. See *Gonzalez v. Quinones*, 211 F.3d 735, 739 (2d Cir. 2000) (noting that any exclusion during a chemist's testimony

would be trivial because "the testimony … was brief (under 20 minutes), perfunctory, and uncontested").

Similarly, the closing arguments in the case began well before the courthouse doors were locked at 5:00 p.m. The government concluded at 4:38 p.m., and defense commenced at 4:39 p.m. As the defense concluded by 5:21 p.m., anyone seeking to attend presumably would have entered the building by 5:00 p.m. Only the government rebuttal, and the subsequent jury instructions, response to questions, and announcing of the verdict, occurred after 5:00 p.m. It is an insignificant possibility that persons would seek to attend the trial only to witness the government rebuttal and subsequent jury interaction.

And as the district court noted, Anderson "makes no claim that any spectators present in the courtroom were required to leave at 5:00 p.m., that anyone tried to attend after 5:00 p.m. but could not get in, or that anyone was actually excluded from the courtroom at any time." Therefore, we are not presented with a case in which friends or relatives of the defendant, or anyone else for that matter, were actually excluded because the courthouse was locked at 5:00 p.m. See *In re Oliver*, 333 U.S. 257, 271–72 (1948) (noting that all courts have held that a defendant is entitled to have friends and relatives attend his trial); *Braun*, 227 F.3d at 917 (same); *United States v. Perry*, 479 F.3d 885, 890–91 (D.C. Cir. 2007). We noted in *Braun* that, in assessing the values protected by the right to a public trial, it was "not without significance" that the exclusion did not involve a relative or friend of the defendant. 227 F.3d at 919. In fact, it is not even clear that there was any effective closure at all in this case, as opposed to more stringent security measures to navigate prior to observing the trial. Although the court-

house is locked at 5:00 p.m. as a security measure, the facts in this case indicate that a guard was available to allow persons access to and from the courthouse after hours. A court security officer was present in the building, because the officer let the jury and defense counsel out of the building at the end of the first day after the doors were locked. And on the second day, the security officer let defense counsel out and back in to the courthouse after hours when defense counsel had to leave after 5:00 p.m. to vote. If a guard was indeed available to provide access, then the requirement to go through that guard to enter the building would not be constitutionally different than the requirement to go through electronic security in the courthouse during the normal operating hours prior to proceeding to the courtroom. But we do not have any factual findings by the district court as to the availability of that access generally, so we do not base our decision on that.

Nevertheless, the closure in this case was a minimal one because anyone in the building before 5:00 p.m. could attend the trial in its totality, and there were only minimal proceedings after 5:00 p.m. In that respect, it was critically different than the after-hours scenario addressed by the First Circuit in *United States v. Candelario-Santana*, 834 F.3d 8 (1st Cir. 2016). In that case, the trial court faced a witness who was reluctant to testify in open court, but who rejected both the government's offer to relocate the witness and the court's offer of protection. *Id.* at 21. The court held an in-chambers conference at 5:20 p.m. to address the issue. *Id.* at 20. At that time, the courthouse itself was already closed to the public because it was after 5:00 p.m., although the courtroom remained open. *Id.* at 22. The court then devised a plan whereby the court security officers would

announce that the court was adjourning for the day, and would then resume with the witness once the court was vacated, with the witness being allowed to face away from the defendant and to identify the defendant using a photograph. *Id.* at 21. Over defense counsel's objection, the plan was implemented. The First Circuit held that "[a]lthough the doors to the actual courtroom remained unlocked, the announcement that the court was adjourning, the attorneys' feint at packing up, and the after-hours time at which the court reconvened effected a closure … [and] [b]ecause nothing in the record suggests that any part of the proceeding remained open or any member of the public remained, it was a complete closure." *Id.* at 23. The closure was deliberate rather than inadvertent and the trial court failed to consider the *Waller* factors in enacting the closure including the identification of an overriding interest, and therefore the First Circuit concluded that the closure violated the Sixth Amendment. *Id*.

In contrast to *Candelario-Santana*, there was no effort to close the courtroom in this case to anyone who was there at or after 5:00 p.m. or to anyone who was in the building at 5:00 p.m. or who gained access to the building after that time. The proceedings which occurred after 5:00 p.m. were minor in the trial as a whole. The impact on the ability of anyone to attend the trial was therefore limited in scope and short in duration, and at no time did it present a total prohibition on the ability of either the public as a whole or any individual to attend. We simply cannot conclude that the partial closure of only the outside doors in this case, with the trial still accessible to those in the building and with relatively minimal proceedings after closure, implicated the values of the Sixth Amendment such as ensur-

ing a fair trial, reminding the prosecutor and judge of their responsibility, encouraging witnesses to come forward, and discouraging perjury. *Peterson*, 85 F.3d at 43, citing *Waller*, 467 U.S. at 46–47; *Braun*, 227 F.3d at 918. In light of the law in this area establishing that trivial violations do not run awry of the Sixth Amendment, Anderson has failed to demonstrate an error that is "plain" or "obvious" as required under the plain error standard.

Certainly, district court judges seeking to continue criminal proceedings beyond the closing hours of a courthouse should ensure that members of the public have a means of access to that courthouse. In some cases, such as in *Walton*, the failure to do so will violate the Sixth Amendment. The closure in this case was trivial and did not violate those Sixth Amendment rights, but to avoid such questions in the future, the court should ensure that some means of access to the courthouse is available for trials that run after hours.

Anderson raises a challenge to his sentence as well, arguing that he is entitled to a new sentencing hearing because of the Supreme Court's decision in *Dean v. United States,* 137 S. Ct. 1170 (2017). At sentencing, the defendant asked the district court to offset the consecutive term that was statutorily mandated by § 924(c) by reducing the term of imprisonment on the other charges. The court stated that "the argument Defendant makes here is in some tension with cases like … *Roberson* … and … *Ikegwuonu* … which hold that sentencing Judges may not reduce a prison term for an underlying crime to offset the consecutive term that is Statutorily mandated for filing 924(c)." Transcript of Sentencing at 27. Subsequent to sentencing,

however, *United States v. Roberson*, 474 F.3d 432 (7th Cir. 2007), and *United States v. Ikegwuonu*, 826 F.3d 408 (7th Cir. 2016), which reaffirmed *Roberson,* were abrogated by the Supreme Court's decision in *Dean*, which holds that sentencing courts may consider a mandatory minimum sentence when choosing the appropriate sentence for the predicate offenses. See *United States v. Fox*, 878 F.3d 574, 579–80 (7th Cir. 2017); *United States v. Wheeler*, 857 F.3d 742, 745 (7th Cir. 2017).

There is some ambiguity in the sentencing hearing as to whether the district court nonetheless considered the mandatory sentence in determining its sentence despite its recognition that *Roberson* controlled, but we cannot be certain that the *Roberson* holding did not impact the sentence. To the extent that the district court felt bound in its sentencing by our since-abrogated decision in *Roberson*, a limited remand is appropriate to ascertain whether the district court would be inclined to sentence Anderson differently in light of the Supreme Court's decision in *Dean*. Cf. *United States v. Paladino*, 401 F.3d 471, 483–84 (7th Cir. 2005); see *Wheeler*, 857 F.3d at 745 (noting that resentencing would be necessary "[i]f there were some reason to think that the district court had felt compelled by *Roberson* to set [the defendant's] total sentence at 228 months rather than a shorter term").

We therefore order a limited remand so that the district court can determine whether it would have imposed the same sentence on Anderson, knowing that it can consider the

mandatory sentence in light of *Dean*. We shall retain jurisdic-
tion over this appeal pending the district court's response to
our inquiry.

AFFIRMED in part and REMANDED.