In the

# United States Court of Appeals
## For the Seventh Circuit

No. 22-2800

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SHAMOND JENKINS,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:21-cr-00015-JD-MGG-1 — **Jon E. DeGuilio**, *Judge.*

ARGUED JANUARY 9, 2024 — DECIDED FEBRUARY 14, 2025

Before ROVNER, HAMILTON, JACKSON-AKIWUMI, *Circuit Judges.*

JACKSON-AKIWUMI, *Circuit Judge.* Shamond Jenkins appeals his conviction and sentence for bank robbery. He argues that the jury had insufficient evidence to find him guilty, and the face mask he had to wear during his trial—which took place during the COVID-19 pandemic—led to his Fifth and Sixth Amendment rights being violated. As for his sentence, Jenkins objects to the district court's finding that he warranted

a stiffer sentence for presenting perjured testimony, and its decision to count two juvenile convictions among his criminal history. We affirm.

**I**

This case involves a trio of robberies in northern Indiana between December 2020 and January 2021. The first robbery took place at a Check Into Cash store in Mishawaka, Indiana. On December 17, 2020, a man wearing one surgical mask on his face and another one around his neck walked into the store. He approached the store manager, flashed a handgun, and told her to "give him all the money."

The second robbery occurred two weeks later at a Centier Bank branch in South Bend, Indiana. On December 29, 2020, a man wearing a puffy black jacket and red-and-white Air Jordan sneakers walked into the branch and asked about opening a checking account. Like the Check Into Cash robber, this man wore one surgical mask on his face and a second one around his neck. When bank employee Mishelle Graber asked the man for his social security number so she could open an account for him, he passed her a note that said, "I want at least $15,000. I have a gun." Graber and another bank employee, Paige Beasy, gave the robber the contents of their cash drawers, including a series of "bait bills" that the bank could track in the event of a robbery. During the robbery, the mask around the robber's face slipped down and revealed his nose. The bank's video surveillance system captured the entire incident.

The third robbery happened at a Centier Bank branch in Granger, Indiana. On January 7, 2021, two men walked into the branch. One of them told the bank employees, "Give us

all your money right now or we'll kill you." Both men wore surgical masks, and one man wore red shoes.

The FBI and Indiana State Police identified Jenkins as a suspect in the three robberies and set up a sting to arrest him. On January 8, 2021, after the driver of a car Jenkins was riding in committed a traffic violation, Indiana state troopers stopped the car. When the officers searched the occupants, they found that one of them, Jenkins's girlfriend, had a wad of approximately $5,300 in cash, including a $20 bill that matched one of the bait bills from the South Bend Centier Bank robbery. Jenkins had about $100 in cash, none of it in bait bills. Jenkins was, however, wearing the same type of red-and-white Air Jordan sneakers that the South Bend Centier Bank robber wore.

Jenkins was arrested, and on January 11, 2021, charged with robbing the Check Into Cash store, brandishing a gun during that robbery, robbing the South Bend Centier Bank, and robbing the Granger Centier Bank. Jenkins entered a not guilty plea and a three-day trial began on November 30, 2021.

The government's evidence consisted of witness testimony, in-court identifications, video evidence, and object evidence. Mishelle Graber and Paige Beasy, the South Bend Centier Bank employees, both identified Jenkins in court as the robber. Graber explained that she recognized Jenkins by his hairstyle and "remember[ed] his eyes." Beasy said that Jenkins "look[ed] identical" to the man who robbed the bank and she described his face as one she could not "forget easily."

The government's video evidence consisted of a recording of the South Bend Centier Bank robbery and a YouTube video featuring Jenkins wearing the same black puffy jacket that the

South Bend bank robber wore. The government also presented to the jury the red-and-white Air Jordan sneakers Jenkins was wearing when arrested, which were identical to the shoes worn by the South Bend bank robber. And the jury saw that Jenkins had a neck tattoo that a face mask could have covered.

Jenkins and his mother, Shayla Stroud, testified in his defense. Jenkins told the jury that he could not have robbed the South Bend Centier Bank because he did not own the red-and-white sneakers at the time. He testified that his mother had given him those shoes for his birthday on January 4, 2021 (a week after the South Bend Centier Bank robbery), and he "did not have … shoes like that" before. Stroud corroborated Jenkins's testimony. She testified that she gave Jenkins the red-and-white sneakers for his birthday.

The jury delivered a mixed verdict. It found Jenkins guilty of robbing the South Bend Centier Bank, in violation of 18 U.S.C. § 2113(a), and not guilty of the Granger Centier Bank robbery. The jurors could not reach a unanimous decision about the Check Into Cash robbery.

Before sentencing, Jenkins objected to two of the Presentence Investigation Report's recommendations: (1) an enhancement for obstructing justice by presenting false testimony about the sneakers, and (2) the inclusion of criminal history points for two of Jenkins's juvenile adjudications. Jenkins argued that an enhancement for perjured testimony chilled his right to present a defense. He also argued that the court could not constitutionally consider his juvenile adjudications and, if it did, it should consider them as a single adjudication.

The district court overruled these objections. It reasoned that the jury had found Jenkins guilty of robbing the South Bend Centier Bank on December 29, 2020, while wearing red-and-white sneakers. To this court, this meant Jenkins must have had those shoes before January 4, 2021, and his testimony to the contrary was false. The court also found that each juvenile adjudication merited its own criminal history points. The court determined that Jenkins's unlawful conduct was "separated by an intervening arrest," so the adjudications were considered separate by the United States Sentencing Guidelines. The court applied the criminal history points and the perjury enhancement before sentencing Jenkins to 100 months in prison.

Jenkins now appeals both his conviction and the sentence.

## II

We first evaluate Jenkins's three challenges to his conviction. He contends (1) the district court rendered the witnesses' in-court identifications unduly suggestive by requiring Jenkins to wear a face mask, (2) the face mask prevented him from confronting the witnesses against him, and (3) there was insufficient evidence to convict him. We are not persuaded.

### A. The face mask and in-court identification

Jenkins argues that the district court violated the Due Process Clause of the Fifth Amendment by requiring Jenkins to wear a blue surgical face mask during trial, even at the moment when Beasy and Graber were asked to identify him as the robber. The requirement that Jenkins wear a mask during trial applied to everyone in the courtroom pursuant to the Northern District of Indiana general order then in effect to prevent the spread of COVID-19. *See In the Matter of: Face*

*Masks*, General Order 2021-23 (N.D. Ind. Aug. 2, 2021), *availa-ble at https://www.innd.uscourts.gov/sites/innd/files/2021-23.pdf.* However, the district court did allow everyone who testified, including Jenkins, to remove their masks while testifying.

Jenkins did not object to wearing a face mask during trial or during the in-court identifications specifically, so we evaluate for plain error the court's decision to include Jenkins in the courtroom-wide mask mandate except for when he took the witness stand. *See United States v. Williams*, 931 F.3d 570, 573 (7th Cir. 2019). To prevail on plain error, a party must show "(1) an error, (2) that was plain, (3) that affected his substantial rights, and (4) that seriously affected the fairness, integrity, or public reputation of the proceedings." *United States v. Jones*, 22 F4th 667, 675 (7th Cir. 2022).

As Jenkins sees it, the face mask made the witnesses' in-court identifications of him unduly suggestive. According to Jenkins, he had to wear the same type of blue surgical face mask that the robber wore, causing him to resemble the robber, which in turn improperly suggested to Beasy and Graber that he committed the robbery. Jenkins also complains that the face mask covered his nose during trial, whereas the bank robber's nose was exposed at some point. All of this, he says, violated the Due Process Clause. The government disagrees, contending that only *out-of-court* identifications can be unduly suggestive. The government is not correct on this front, but that is of no moment because the identifications were not unduly suggestive.

There is no doubt an in-court identification may, in some circumstances, be so unduly suggestive as to violate the Constitution. We stated as much in *United States v. Recendiz*, 557 F.3d 511 (7th Cir. 2009). There, we reasoned that an in-court

identification violates the Due Process Clause if the identification procedure is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id.* at 524 (quoting *United States v. Williams*, 522 F.3d 809, 810 (7th Cir. 2008)). But even then, courts should only exclude the unreliable in-court identification if "the source of the error is so elusive that it cannot be demonstrated to a jury, which therefore will give excessive weight to the eyewitness testimony." *Id.* at 526 (quoting *Williams*, 522 F.3d at 811).

Here, we need not consider the reliability of the in-court identifications by Beasy and Graber because the face mask did not render the identifications unduly suggestive. Jenkins's trial took place during the COVID-19 pandemic when blue surgical face masks were ubiquitous, as Jenkins himself acknowledges. It is difficult to understand how, under these circumstances and in a courtroom where everyone was wearing a mask, such a common type of face mask could serve as a particularizing trait that would improperly link the robber and Jenkins in the witnesses' minds.

Furthermore, the jury was well positioned to assess the credibility of the in-court identifications. It heard Beasy and Graber describe their experience, it observed their mannerisms, and it witnessed their cross-examination. The jury, in fact, heard Graber say that, at one point, the face mask was "completely off [the robber's] nose." The jury thus understood how much of the robber's face Beasey and Graber saw and could decide for itself how distinctive a nose is such that the inability to see it in the courtroom might render an in-court identification unreliable. The jury could "weigh the accuracy of the identification" just like any other piece of evidence. *Recendiz*, 557 F.3d at 526. We therefore reject Jenkins's

claim that the district court's decision regarding the face mask was plain error in violation of the Fifth Amendment.

## B. The face mask and witness confrontation

We now turn to Jenkins's second complaint about the face mask. Jenkins contends the face mask impeded his ability to confront witnesses against him in violation of the Sixth Amendment. Jenkins did not object during trial, so we evaluate this argument, too, for plain error. *See Williams*, 931 F.3d at 573. Applying that standard, we conclude that Jenkins's second argument fares no better than his first.

Jenkins maintains that because the Sixth Amendment gives a criminal defendant the right to "be confronted with the witnesses against him," anything that impedes a bare face-to-face confrontation violates the Sixth Amendment. U.S. Const. amend. VI. This is too narrow a reading of the Sixth Amendment. According to the Supreme Court, the Confrontation Clause does not give a defendant the unqualified right to look at witnesses, unencumbered by any physical article whatsoever. *See Maryland v. Craig*, 497 U.S. 836, 849 (1990) (ruling that face-to-face confrontation is not always an indispensable element of the Confrontation Clause). If that were the case, "the Clause would then, contrary to our cases, prohibit the admission of any accusatory hearsay statement made by an absent declarant." *Id.* Rather, the Confrontation Clause "reflects a *preference* for face-to face confrontation at trial," one that "must occasionally give way to considerations of public policy and the necessities of the case." *Id.* (internal citations omitted). The need to prevent the spread of COVID-19 was an important public policy goal that warranted the requirement of face masks in the courtroom.

Moreover, the face mask did not impede Jenkins from achieving the central purpose of the Confrontation Clause: to ensure that the defendant has an opportunity to cross-examine witnesses. *See Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986) ("[T]he main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination*." (quoting *Davis v. Alaska*, 415 U.S. 308, 315–16 (1974)). Jenkins had a full opportunity for cross-examination. Jenkins may be *dissatisfied* with his attorney's cross-examination. But that does not impact our constitutional analysis. The Confrontation Clause guarantees "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Kentucky v. Stincer*, 482 U.S. 730, 739 (1987) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)). When, as here, Jenkins had that opportunity, there is no Confrontation Clause violation.

We also reject Jenkins's argument that the district court's alleged Confrontation Clause error of having Jenkins and everyone else not on the witness stand wear masks was a structural error subject to automatic reversal. "Structural errors are errors that affect the 'entire conduct of the [proceeding] from beginning to end.'" *Greer v. United States*, 593 U.S. 503, 513 (2021) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991)). As stated, we do not find any error, much less a structural one. And, in any case, had we determined there *was* a Confrontation Clause violation, we would evaluate it for harmless error, not as if it were structural error. *See United States v. McGee*, 408 F.3d 966, 975 (7th Cir. 2005) ("[E]ven if the court's ruling amounted to a violation of the defendants' Confrontation Clause rights, the ruling is subject to harmless error review.").

## C. Sufficiency of the evidence

In his opening brief, Jenkins raised an additional challenge to his conviction: the jury had insufficient evidence to convict him. However, in his reply brief he agreed with the government that his trial attorney knowingly waived a sufficiency of the evidence challenge. We will not evaluate a sufficiency of the evidence challenge if the defendant waived that challenge in the trial court. *See United States v. Waldrip*, 859 F.3d 446 (7th Cir. 2017). Therefore, we do not consider this argument.

## III

Having found no error at trial, we next consider Jenkins's sentencing arguments. Jenkins takes issue with two of the district court's decisions—applying a sentencing enhancement for obstruction of justice and imposing criminal history points for two of Jenkins's juvenile offenses. We uphold both decisions.

## A. Obstruction of justice enhancement

The district court applied a sentencing enhancement for obstruction of justice based on what it found to be Jenkins's perjured testimony. Jenkins asks us to overturn the decision, arguing that it chilled his right to present testimony in his defense. The law and the facts of Jenkins's case are not on his side.

Jenkins is correct that defendants have a right to present testimony in their own defense. *Makiel v. Butler*, 782 F.3d 882, 907 (7th Cir. 2015) ("The Sixth Amendment … together with the Due Process Clause of the Fourteenth Amendment, 'embodies a substantive right to present a meaningful and complete criminal defense.'" (quoting *Harris v. Thompson*, 698 F.3d 609, 626 (7th Cir. 2012)). But we have said that defendants do

not have a right to lie to the jury. *See United States v. Stenson*, 741 F.3d 827, 830–31 (7th Cir. 2014) ("[W]hile a defendant is allowed to testify on his own behalf, he does not have the right to commit perjury.").

The United States Sentencing Guidelines contain penalties for defendants who are believed to have committed perjury. The guidelines advise the sentencing court to enhance a defendant's offense level if it finds by a preponderance of evidence that the defendant "willfully obstructed or impeded, or attempted to obstruct or impede the administration of justice." *United States v. White*, 240 F.3d 656, 660 (7th Cir. 2001) (quoting U.S.S.G. § 3C1.1). Perjury is a "well-settled example" of obstruction "that may warrant an enhancement under § 3C1.1." *Stenson*, 741 F.3d at 830. A court may find that a defendant committed perjury if the defendant willfully intended to provide material, false testimony. *See id.* We review the court's factual findings of perjury for clear error and consider de novo whether the findings support the enhancement. *See United States v. Thomas*, 833 F.3d 785, 793 (7th Cir. 2016).

The district court found that Jenkins intentionally offered false testimony twice: when he testified that he did not own his red-and-white Air Jordan sneakers until after the South Bend robbery and when he had his mother testify that she gave him the sneakers after the robbery. Either one of these findings would support the enhancement if the court committed no clear error. We therefore limit our analysis to Jenkins's testimony.

We cannot say that the district court committed clear factual error when it found by a preponderance of evidence that Jenkins willfully provided false testimony. Nor can we say that the court lacked a basis for the obstruction of justice

enhancement after making this finding. The robber, who committed that robbery alone, wore the same type of red-and-white sneakers that Jenkins owned. The jury found that Jenkins robbed the South Bend Centier bank, so it is a fair inference that Jenkins was the robber wearing the red-and-white sneakers, whether owned or borrowed. Yet Jenkins was adamant on the witness stand that he did not have (not just own, but "have") a pair of shoes like that until his mother gifted them *after* the bank robbery. The court's conclusion that Jenkins's testimony was false was a reasonable conclusion, and therefore not clear error.

To constitute perjury, however, testimony must not only be false, but also material. Jenkins's testimony about the shoes was undoubtedly material. Jenkins offered the testimony for an important reason: to show that he could not have been the robber. The main question during trial was one of identity. Jenkins tried to use the shoes to move the needle on this question. Consequently, we find no reversible error in the district court's application of the obstruction enhancement.

## B. Criminal history points for juvenile convictions

We end with Jenkins's argument that the district court erred by assigning criminal history points for two different juvenile adjudications. We cannot agree.

The United States Sentencing Guidelines provide that courts may apply two criminal history points for "each prior sentence of at least sixty days." U.S.S.G. § 4A1.1(b). Prior sentences merit separate criminal history points "if the sentences were imposed for offenses that were separated by an intervening arrest." *Id.* at § 4A1.2(a)(2).

The two juvenile convictions at issue were separated by an intervening arrest and therefore earned their own criminal history points. The Presentence Investigation Report contains the following details: On September 22, 2016, Jenkins violated his probation by cutting off his home detention ankle monitor and fleeing. He was then arrested for escaping on November 6, 2016. On December 7, 2016, Jenkins threatened to kill an employee who worked for the Juvenile Justice Center where he was living, and he was charged with intimidation. Under the plain language of the Sentencing Guidelines, Jenkins was "arrested for the first offense" (the probation violation) "prior to committing the second offense" (the intimidation). U.S.S.G. § 4A1.2(a)(2). The district court correctly counted them as two separate offenses for sentencing purposes.

Jenkins argues that the offenses should be treated as a single sentence because the juvenile court imposed sentences for the two offenses on the same day. He insists that means the adjudications were "effectively consolidated" and should not get separate criminal history points.

For his "effectively consolidated" argument, Jenkins relies on *United States v. Vallejo*, 373 F.3d 855 (7th Cir. 2004), and *United States v. Graves*, 418 F.3d 739 (7th Cir. 2005). He cites the two cases for the proposition that multiple cases may be treated as a single incident for sentencing purposes if the defendant can show the cases were effectively consolidated. But the cases predate the amendment to Sentencing Guidelines that became effective on November 1, 2007, which "provides that multiple sentences should be regarded as one if they were imposed on the same day, unless there was an intervening arrest." *United States v. Statham*, 581 F.3d 548, 554 (7th Cir. 2009). *Vallejo* and *Graves*, then, are outdated on this point.

Jenkins makes one final argument about his juvenile convictions. He asks us to hold that sentencing courts may not constitutionally consider juvenile adjudications as part of a defendant's criminal history at all. But, as we explain below, our precedent forecloses this path. And we decline Jenkins's implicit invitation to overrule that precedent absent "a compelling reason" such as "decisions of a higher court, or other supervening developments, such as a statutory overruling." *Santos v. United States*, 461 F.3d 886, 891 (7th Cir. 2006) (internal quotations omitted).

The Sentencing Guidelines explicitly direct courts to consider juvenile adjudications during sentencing. *See* U.S.S.G. § 4A1.2(d)(2) ("[A]dd 2 points … for each adult or juvenile sentence to confinement of at least sixty days."). Our circuit found this provision constitutional in *United States v. Davis*, 48 F.3d 277, 279 (7th Cir. 1995), which held that "no due process violation is involved in the Guidelines' directive to consider juvenile convictions in a defendant's criminal history." Since then, our court has consistently approved district courts' consideration of juvenile convictions during sentencing. *See, e.g.,* *United States v. Eubanks*, 593 F.3d 645, 654 (7th Cir. 2010); *United States v. Gill*, 824 F.3d 653, 657 (7th Cir. 2016).

Jenkins points to the out-of-circuit decision *United States v. Washington*, 462 F.3d 1124 (9th Cir. 2006), as support for his desired rule that courts should not assess criminal history points for juvenile adjudications that do not stem from jury verdicts. But *Washington* does not stand for that proposition. In *Washington*, the Ninth Circuit held that a district court may not rely on a juvenile adjudication that did not afford the right to a jury trial "to impose a sentence above the maximum sentence authorized … at that time." *Id.* at 1142. That holding is

not relevant to Jenkins's case, where the juvenile convictions did not cause the district court to impose a sentence exceeding the statutory maximum of 20 years. Jenkins's sentence was 100 months.

For the reasons above, we AFFIRM the judgment of the district court.