In the

# United States Court of Appeals
## for the Seventh Circuit

―――――――――――

No. 24-2671

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MICHAEL J. YUMANG,

*Defendant-Appellant.*

―――――――――――

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 22 CR 194 — **J. P. Stadtmueller**, *Judge.*

―――――――――――

ARGUED SEPTEMBER 25, 2025 — DECIDED JANUARY 9, 2026

―――――――――――

Before BRENNAN, *Chief Judge*, and EASTERBROOK and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. In 2019 and 2022, police searched Michael Yumang's car and home in suburban Milwaukee and discovered distribution quantities of methamphetamine, a handgun, and ammunition. Just before the 2022 search, a postal inspector intercepted an additional quarter pound of meth in a package mailed to Yumang's residence from an address in Los Angeles. Yumang admitted to police that he

regularly obtained methamphetamine from a source in California and resold it to others.

Yumang was charged with three drug-trafficking crimes: one count for each of the 2019 and 2022 meth seizures, and the third, an attempt offense, for the intercepted meth shipment. He was also charged with unlawfully possessing a firearm in furtherance of a drug crime. Yumang opted for a bench trial and testified that the meth was either for his personal use or belonged to someone else. The district judge found him guilty on all counts.

On appeal Yumang raises two claims of trial error, both linked to the testimony of one of the government's drug analysts. Three forensic chemists—two from the Drug Enforcement Administration and one from the postal service—analyzed the three batches of meth recovered in 2019 and 2022. To comply with its *Brady* and *Giglio* obligations,[1] the government disclosed that the DEA chemist who performed the 2019 test was placed on a performance improvement plan in 2023. The disclosure was covered by a protective order to maintain the confidentiality of this information.

When the prosecutor presented the chemist as a witness at trial, Yumang's attorney sought to cross-examine her about the performance improvement plan. Because of the protective order, counsel asked to first discuss the matter at sidebar. In a brief discussion at the bench, the judge disallowed the proposed cross-examination as irrelevant. The sidebar was not recorded, however, so the prosecutor later suggested that the parties make a record of what was said. Yumang's

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972).

attorney responded by asking if they should do so in closed or open session; the prosecutor then asked the judge to close the courtroom for this purpose. The judge agreed and closed the courtroom for five minutes while the parties made a record of the sidebar.

Yumang now argues that the brief courtroom closure violated his Sixth Amendment right to a public trial. But he raised the subject of closure himself and then acquiesced when the prosecutor asked the judge to close the courtroom. The government argues that Yumang invited the error, which would preclude review. That's a reasonable position, but we needn't decide. At a minimum Yumang forfeited the issue, and his belated claim doesn't meet the standard for relief on plain-error review. The brief courtroom closure was too trivial to be a Sixth Amendment error at all, let alone a reversible plain error.

Yumang also challenges the exclusion of his proposed cross-examination of the chemist. But the judge reasonably concluded that the 2023 performance improvement plan was irrelevant because the chemist's work on this case occurred in 2019, three and a half years earlier, when there were no concerns about her proficiency. That ruling was neither an evidentiary error nor a Confrontation Clause violation. Moreover, there is no doubt about the nature and quantity of the drugs—Yumang admitted in his recorded statements that he possessed and distributed methamphetamine—so any possible error was harmless. We affirm the judgment.

## I. Background

In February 2019 police officers investigating a hit-and-run accident in Cudahy, Wisconsin, identified the suspect's

vehicle as a Honda Civic registered to Michael Yumang. They went to Yumang's Cudahy residence and located the car parked outside.

On closer inspection, Officer Brian Bloch saw a bag of methamphetamine, a bullet, and a digital scale, all in plain view through the car's windows. Following a canine alert, the police secured a search warrant and seized the suspicious items. They then called Yumang, who agreed to come to the police station for an interview.

During the recorded interview, Yumang admitted that he regularly obtained methamphetamine from a source, resold it, and returned the sale proceeds to the source. He also acknowledged that he had a lot more meth at home and agreed to the officers' request to search his residence. After signing a consent form, he accompanied the officers while they searched his home and found several bags of methamphetamine and drug-dealing paraphernalia in the living area and basement. Yumang also directed the officers to his bedroom, where they found a loaded handgun hidden behind some clothing in the closet.

Yumang was not immediately charged with a crime. The record suggests that his cooperation with law enforcement may have earned him a second chance. Still, the officers sent the seven bags of meth collected from Yumang's home and car to the DEA lab for testing. In December 2019 a forensic chemist tested the drugs and concluded that together they contained 55.55 grams of 100% pure methamphetamine.

There things stood until March 2022, when a local postal inspector noticed a stream of suspicious packages sent from an address in Los Angeles to Yumang's house in Cudahy (via

Chicago and Wichita, Kansas). In April the inspector obtained a warrant to search one of the packages; it contained a cellphone and over 100 grams of methamphetamine wrapped in cellophane. This discovery prompted yet another search of Yumang's home, during which officers located marijuana, methamphetamine, and various items of drug-dealing paraphernalia scattered throughout the house. In another recorded interview with police, Yumang admitted that for the last few years he had received shipments of distribution quantities of methamphetamine from a source in California and resold the meth in Wisconsin.

A grand jury indicted Yumang and a codefendant on conspiracy, methamphetamine-trafficking, and firearm charges. Two years of tumultuous pretrial proceedings followed, attributable in large part to Yumang's recurrent clashes with his appointed counsel. Meanwhile, the codefendant resolved his case, and the government obtained a superseding indictment against Yumang alone.

The new indictment charged five crimes: (1) possession of 50 grams or more of methamphetamine with intent to distribute, 21 U.S.C. § 841(a)(1), (b)(1)(A) (for the meth recovered in the 2019 searches); (2) possession of a firearm in furtherance of that crime, 18 U.S.C. § 924(c)(1)(A)(i) (for the firearm found in Yumang's bedroom in 2019); (3) attempted possession of 50 grams or more of methamphetamine with intent to distribute, § 841(a)(1), (b)(1)(A), § 846; (for the 2022 intercepted meth shipment); (4) possession of 5 grams or more of methamphetamine with intent to distribute, § 841(a)(1), (b)(1)(B) (for the meth recovered in the 2022 search); and (5) a conspiracy count, § 841(a)((1).

With the trial date looming, Yumang waived his right to a jury, and the government then moved to dismiss the conspiracy count. The judge granted the government's motion, accepted Yumang's jury waiver, and converted the jury-trial date to a court trial.

The trial spanned just two days. The details are largely irrelevant here, so we'll stick to the most important parts. The government called eleven witnesses: eight law-enforcement officers and the three forensic chemists who tested the seized methamphetamine and confirmed its weight and degree of purity. The government also introduced Yumang's two recorded statements to the police in which he admitted to regularly sourcing methamphetamine from California and selling it in Wisconsin.

Yumang's appeal centers on the DEA chemist who tested the methamphetamine recovered in the 2019 searches of his car and home. Before trial the government had asked the DEA and postal-service labs for any potential *Giglio* evidence concerning the three forensic chemists who worked on the case. The DEA disclosed that the chemist who performed the 2019 testing had recently been placed on a performance improvement plan. More specifically, the performance improvement plan, dated June 2023, identified certain deficiencies in the chemist's productivity and technical competence. The government turned this information over to the defense subject to a protective order maintaining its confidentiality until further court order.

As noted, the government called the chemist as a witness at trial. Yumang's attorney did not challenge her qualifications as an expert or raise any other objection to her testimony. She testified that the drugs recovered from

Yumang's car and home in the 2019 searches were 100% pure methamphetamine with a total weight of 55.55 grams.

Before beginning his cross-examination, Yumang's counsel requested a sidebar to discuss a confidential matter. A two-minute conversation at the bench followed. When it was over, Yumang's attorney announced that he had no questions for the chemist. The judge excused the witness and the government continued with its case. As we've noted, in addition to law-enforcement witnesses, the prosecutor called the two analysts who tested the other batches of methamphetamine. They also testified without objection or cross-examination, confirming the weight and high degree of purity of the meth seized in 2022.

The sidebar was not preserved in a verbatim recording, so there is no transcript of what transpired. But we know the gist of what was discussed based on what happened later in the trial. Just before the government concluded its case in chief, the prosecutor suggested that the parties make a record of what occurred at sidebar. The judge agreed. Yumang's counsel asked if the parties should make their record in open court or in a closed courtroom. With that prompt, the prosecutor asked the judge to seal the courtroom "for this purpose," based on the protective order. The judge obliged and invited those in the gallery to "step out in the hall."

With the courtroom closed, Yumang's attorney explained that he wanted to cross-examine the chemist about the 2023 performance improvement plan but first sought the court's permission at sidebar because of the protective order. During the sidebar discussion, the government objected to the proposed cross-examination, and the judge excluded questions about the performance improvement plan as irrelevant

because the chemist had worked on this case in 2019, several years earlier. More specifically, the judge ruled that because the chemist's performance improvement plan postdated her analysis of the evidence in Yumang's case by nearly four years, it did not bear on the integrity of her work.

The judge confirmed counsel's summary of the sidebar. The prosecutor added for the record that in 2019, when the chemist worked on Yumang's case, she had passed all proficiency testing. The prosecutor also observed that the primary focus of the 2023 performance improvement plan was the chemist's productivity, not her proficiency. Yumang's attorney disagreed with that characterization. The judge intervened and ended the discussion by reiterating that he had excluded the proposed cross-examination because the performance improvement plan came nearly four years after the chemist's work on this case. With that, the judge reopened the courtroom. The closure lasted only five minutes.

The government then rested its case. Yumang testified in his own defense and attempted to deflect responsibility for the methamphetamine and firearm found during the 2019 searches. He also testified that the meth discovered in 2022 was solely for his personal use. The judge found him guilty on all counts and imposed the minimum possible sentence of 180 months in prison.

## II. Discussion

Yumang raises two related issues on appeal. First, he argues that the judge's closure of the courtroom violated his Sixth Amendment right to a public trial. Second, he asserts that the judge's exclusion of his proposed cross-examination of the DEA chemist about her performance improvement plan

was both an evidentiary error and a Confrontation Clause violation.

## A. Courtroom Closure

The Sixth Amendment guarantees a criminal defendant "the right to a speedy and public trial." U.S. CONST. amend. VI. As the Supreme Court has said, the public-trial right restrains the "possible abuse of judicial power" by instilling in judges the "knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion." *In re Oliver*, 333 U.S. 257, 270 (1948). "[T]he presence of interested spectators" also ensures that jurors remain "'keenly alive to a sense of their responsibility,'" "encourages witnesses to come forward," and "discourages perjury." *Waller v. Georgia*, 467 U.S. 39, 46 (1984) (quoting *Gannett Co. v. DePasquale*, 443 U.S. 368, 380 (1979)). The public-trial right protects the interests of the general citizenry too: open proceedings allow community members to see that the accused "is fairly dealt with and not unjustly condemned." *Id.* (quotation marks omitted); *see Weaver v. Massachusetts*, 582 U.S. 286, 298–99 (2017).

Like other constitutional rights, the right to a public trial is not absolute and "may give way in certain cases to other rights or interests," such as "the government's interest in inhibiting disclosure of sensitive information." *Waller*, 467 U.S. at 45. And if trivial or de minimis, a courtroom closure may not violate the Sixth Amendment at all. *See Braun v. Powell*, 227 F.3d 908, 918 (7th Cir. 2000).

To determine whether a courtroom closure is trivial, we assess the extent to which it affects the values we just mentioned. *United States v. Anderson*, 881 F.3d 568, 573 (7th Cir.

2018). If these values are not "implicated in any substantial way"—in other words, if there is no reason to believe that a "trial was any less fair, or that the court officers or witnesses took their roles any less seriously"—a brief exclusion of the public does not raise Sixth Amendment concerns. *Braun*, 227 F.3d at 919.

Before applying these principles to this case, we pause to address the standard of review. Yumang did not object to the exclusion of the public from the courtroom, so at best our review is limited by the plain-error standard. But the government goes a step further, arguing that Yumang invited the error he now raises, which precludes review. *See United States v. Grisanti*, 943 F.3d 1044, 1052 (7th Cir. 2019) ("A party may not invite error and then argue on appeal that the error for which he was responsible entitles him to relief." (quotation marks omitted)).

While we take the government's point, we need not decide whether Yumang invited the courtroom closure. Giving him the benefit of the doubt, he has not met his burden to win relief under the plain-error standard. *See Anderson*, 881 F.3d at 572 (confirming that the plain-error standard applies "to unpreserved claims that the defendant was denied the right to a public trial"). Put simply, this brief and inconsequential closure of the courtroom was not a "clear or obvious" Sixth Amendment error. *Id.* Indeed, it was too trivial to be a Sixth Amendment error at all.

Recall that the point of the closure was to memorialize the earlier off-the-record sidebar. As the end of trial neared, the prosecutor suggested that the parties make a record of what was discussed. The judge agreed, and after a prompt from Yumang's attorney and an explicit request from the

prosecutor, closed the courtroom while the attorneys described the sidebar. What followed was a brief discussion, spanning just over two pages of the trial transcript, in which the parties summarized their positions regarding the proposed cross-examination and the judge reiterated his ruling that the chemist's performance improvement plan was irrelevant. The courtroom was then reopened; the closure lasted just five minutes.

"A trivial exclusion is one that is limited in duration and scope." *Id.* at 574. That describes what happened here: the closure was exceedingly brief, and it insulated from public scrutiny a perfunctory discussion of a single issue—namely, the relevance of the analyst's performance improvement plan. Perhaps most importantly, the judge did not rule on that issue while the courtroom was closed; he had already done so during the sidebar earlier in the trial.

Yumang's attorney acknowledged at oral argument that a sidebar conversation (this one included) does not violate the public-trial right. At least two of our sister circuits seem to agree. *See Rovinsky v. McKaskle*, 722 F.2d 197, 201 (5th Cir. 1984) ("Sidebar conferences in which the defendant's counsel participates without objection do not violate the right to a public trial."); *United States v. Gallman*, 57 F.4th 122, 126 (3d. Cir. 2023) ("The public-trial right likely does not extend to sidebars … ."); *see also Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 598 n.23 (1980) (Brennan, J., concurring in the judgment) ("[W]hen engaging in interchanges at the bench, the trial judge is not required to allow public or press intrusion upon the huddle."). If the sidebar itself did not violate the Sixth Amendment, we struggle to see how the courtroom closure to memorialize it did.

Setting that point aside, the only event the public missed—making a record of what occurred at sidebar—was a minor formality. *See Anderson*, 881 F.3d at 576 (noting that the proceedings during the closure "were minor"); *cf. Smith v. Titus*, 141 S. Ct. 982, 982 (2021) (Sotomayor, J., dissenting from denial of certiorari) ("[T]he judge cleared all members of the public from the courtroom before issuing a *key evidentiary ruling*." (emphasis added)). A courtroom closure of this duration and scope does not implicate the public-trial right. This was a bench trial, so there is no concern about the effect of the closure on jurors. And nothing suggests that the judge took his role less seriously or that Yumang's trial was less fair because of the closure. *Braun*, 227 F.3d at 919. Finally, the closure was too brief and inconsequential to affect the community's interest in an open trial. In short, there is no reason to think that the closure implicated any of the protections secured by the Sixth Amendment. Accordingly, it did not violate Yumang's Sixth Amendment right to a public trial—much less clearly or obviously so.

Our decision in *Anderson* confirms the triviality of the closure at issue here. There the judge twice allowed the defendant's trial to proceed after 5 p.m.—that is, after the main courthouse doors had been locked for the night. *Anderson*, 881 F.3d at 571. As a result, anyone who was not already in the building missed the testimony of three government witnesses, a portion of defense counsel's closing argument, the prosecutor's rebuttal argument, the judge's instructions to the jury, and the jury's verdict. *Id.*

Even so, we concluded that the exclusion of additional spectators after the courthouse closed was trivial, in part because locking the courthouse doors did not "impact a

significant portion of the case." *Id.* at 574. More to the point, "anyone in the building before 5:00 p.m. could attend the trial in its totality, and there were only minimal proceedings" that occurred after. *Id.* at 575.

The courthouse closure in *Anderson* encompassed a total of six hours of trial time—far longer than the five-minute courtroom closure in this case. And as compared to the witness testimony, closing arguments, jury instructions, and verdict at issue in *Anderson*, the courtroom closure in Yumang's case covered only a single and ultimately inconsequential evidentiary ruling. We'll turn to the merits of that evidentiary ruling next. But in sum, the courtroom closure to make a record of the sidebar discussion did not violate Yumang's Sixth Amendment right to a public trial.

## B. Cross-Examination of the Forensic Chemist

Yumang also challenges the judge's exclusion of his proposed cross-examination of the DEA chemist who analyzed the methamphetamine seized in the 2019 searches of his car and home. The judge held that the chemist's 2023 performance improvement plan was irrelevant because her work in this case occurred years earlier. That conclusion, Yumang argues, was both an ordinary evidentiary error and a violation of his rights under the Confrontation Clause.

It was neither. Taking the constitutional argument first, the Confrontation Clause guarantees the right of an accused to effectively cross-examine the witnesses against him. *United States v. Gibson*, 996 F.3d 451, 466 (7th Cir. 2021). But the right is not unlimited: the Confrontation Clause does not entitle the accused to a "cross-examination that is effective in whatever way, and to whatever extent," he might wish. *Delaware v.*

*Fensterer*, 474 U.S. 15, 20 (1985). "[T]rial judges retain wide latitude … to impose reasonable limits" on cross-examination, including by foreclosing inquiries that are "only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

As the government sees it, that's exactly what the judge did here. He reasonably determined that the chemist's performance improvement plan had no bearing on the integrity or quality of her work in this case because it postdated her analysis of the meth found in Yumang's car and home by three and a half years; as of 2019, when she conducted her analysis, she had passed all proficiency testing.[2] The government adds that nothing about Yumang's defense turned on the chemist's test results. His attorney did not cross-examine the other chemists, and given the consistency in all three analysts' results, the excluded impeachment was destined to fail.

Relatedly, the government notes that there was no serious doubt about the nature of the drugs seized in any of the searches. Yumang admitted in his recorded statements to the police that he possessed methamphetamine—lots of it—and resold it in Wisconsin. He again admitted in his trial testimony that he possessed methamphetamine.

---

[2] As we've noted, during the colloquy memorializing the sidebar, the prosecutor also took the position that the chemist's performance improvement plan focused more on problems with her *productivity* than her *proficiency*. Yumang's attorney disputed that characterization, but the disagreement doesn't matter here. The government hasn't reiterated the point on appeal. To the extent that the judge relied on it in support of his relevancy ruling, we do not consider it.

We agree with the government that the judge's exclusion of cross-examination about the chemist's performance improvement plan did not violate the Confrontation Clause. Although impeachment is a core Confrontation Clause value as a general matter, judicial limits on cross-examination do not invariably implicate that core value. *United States v. Hart*, 995 F.3d 584, 589–90 (7th Cir. 2021). Exclusion of irrelevant or marginally relevant impeachment evidence falls within the trial judge's wide discretion and does not deprive the accused of a reasonable opportunity to confront the witnesses against him. *Id*.

The long gap in time between the chemist's 2019 work on this case and her 2023 performance improvement plan made the latter only minimally relevant (if at all) as a basis to impeach her testimony about the weight and purity of the methamphetamine she tested. And the defense conceded that it *was* methamphetamine: Yumang admitted in his trial testimony that he possessed methamphetamine. We note too that because this was a bench trial, the judge functioned as both gatekeeper and factfinder, so his assessment of the relevance of the performance improvement plan cannot be disentangled from the evidentiary weight he would have given it if it had been the subject of cross-examination. On these facts, we see no Confrontation Clause error—or even if there was an error, it was harmless. *See United States v. Jenkins*, 128 F.4th 885, 891 (7th Cir. 2025) (confirming that violations of the Confrontation Clause are subject to harmless-error review).

For similar reasons Yumang's garden-variety evidentiary challenge fails. He argues that the threshold for relevance under Rule 401 is low and that "[r]elevant evidence remains

relevant even if directed to an undisputed fact." *United States v. Hamzeh*, 986 F.3d 1048, 1055 (7th Cir. 2021). All true. But it's equally true that there are degrees of relevance and that relevant evidence may be excluded if its probative value is substantially outweighed by the risk of confusion of the issues, unfair prejudice, or a waste of time (among other reasons) under Rule 403's balancing test. Perhaps the judge had this principle in mind when he excluded this line of cross-examination. To the extent that the chemist's 2023 performance improvement plan had any relevance at all to the integrity and reliability of her work on Yumang's case three and a half years earlier, it was so minimal as to be a waste of time and perhaps also a potentially confusing and unfairly prejudicial detour (given the tangential and sensitive nature of the chemist's personnel records).

In the end, a trial judge's evidentiary rulings get substantial deference, for good reason. Trial judges have wide discretion over decisions to admit or exclude evidence and are better positioned to make these judgments; we review only for abuse of that discretion. *United States v. Lewisbey*, 843 F.3d 653, 657 (7th Cir. 2016). We will not substitute our view of the evidence for the trial judge's "merely because we may be inclined to rule differently on the question of relevancy." *United States v. Boros*, 668 F.3d 901, 907 (7th Cir. 2012) (quotation marks omitted). Rather, we defer to the trial judge and "will reverse only if no reasonable person could take the judge's position." *United States v. Trudeau*, 812 F.3d 578, 590 (7th Cir. 2016).

Here the judge reasonably excluded cross-examination on the chemist's 2023 performance improvement plan on relevancy grounds. Even if we assume that it was error to

exclude this cross-examination (it was not), a new trial is unwarranted unless the error prejudiced Yumang's substantial rights. *Id.* Given the overwhelming evidence of his guilt, there is no possibility of that here.

AFFIRMED